Susan M. ROSENBERG,
Plaintiff, Appellee,

v.

MERRILL LYNCH, PIERCE, FENNER
& SMITH, INC. and John Wyllys,
Defendants, Appellants.

No. 98–1246.

United States Court of Appeals,
First Circuit.

Heard July 27, 1998.

Decided Feb. 24, 1999.

Allan Dinkoff, with whom Christopher P. Litterio, Barry Y. Weiner, Shapiro, Israel & Weiner, P.C., Mark K. Dichter, Joseph J. Costello, Marifrances Dant Bolger, and Morgan, Lewis, & Bockius LLP were on brief, for appellants.

Marc Redlich, with whom Merle Ruth Hass, Law Offices of Marc Redlich, and Richard P. Goodkin were on brief, for appellees.

Sally Dunaway, Cathy Ventrell–Monsees, AARP Foundation Litigation, Melvin G. Radowitz, and American Association of Retired Persons on brief for amicus curiae American Association of Retired Persons.

Joel Z. Eigerman, Roche, Carens & DeGiacomo, P.C., and Jeffrey M. Friedman on brief for amicus curiae American Jewish Congress.

Erin Quinn Gery, Ann Elizabeth Reesman, McGuiness & Williams, Stephen A. Bokat, Robin S. Conrad, Sussan L. Mahallati, and National Chamber Litigation Center, Inc. on brief for amici curiae Equal Employment Advisory Council and The Chamber of Commerce of the United States.

Robert J. Gregory, with whom C. Gregory Stewart, Philip B. Sklover, and Lorraine C. Davis were on brief, for amicus curiae Equal Employment Opportunity Commission.

Michael Rubin, Altshuler, Berzon, Nussbaum, Berzon & Rubin, Cliff Palefsky, and McGuinn, Hillsman & Palefsky on brief for amici curiae National Employment Lawyers Association, NOW Legal Defense and Education Fund, National Women's Law Center, and National Partnership for Women and Families.

Russell E. Brooks, Stacey J. Rappaport, and Milbank, Tweed, Hadley & McCloy on brief for amicus curiae New York Stock Exchange, Inc.

Jody E. Forchheimer, Rinchelle S. Kennedy, and Bingham Dana LLP on brief for amicus curiae The Securities Industry Association.

Susan Von Struensee on brief for amicus curiae Susan Von Struensee.

Sydelle Pittas and Pittas Koenig on brief for amicus curiae The Women's Bar Association (of Massachusetts).

Before BOUDIN, Circuit Judge, WELLFORD, Senior Circuit Judge,* and LYNCH, Circuit Judge.

LYNCH, Circuit Judge Circuit Judge.

The question raised is whether Congress intended to prohibit enforcement of pre-dispute arbitration agreements covering employment discrimination claims under Title VII and the Age Discrimination in Employment Act as a matter of law in all cases or at least under certain facts said to be present here. Every circuit that has considered the issue save one has upheld the use of such agreements. The case here, in which the district court refused to compel a plaintiff to arbitrate such claims when the employer wished to arbitrate under a pre-dispute agreement, has also drawn much attention in the form of nine briefs amici curiae.

The plaintiff, Susan Rosenberg, signed a standard securities industry form, the "U–4 Form," agreeing to arbitrate certain claims after being hired by Merrill Lynch, Pierce, Fenner & Smith as a trainee financial consultant. The form itself did not state which claims were to be arbitrated, but rather referred to the rules of various organizations with which Rosenberg was registering.

* Of the Sixth Circuit Court of Appeals, sitting by designation.

When her employment was later terminated, Rosenberg filed suit alleging age and gender discrimination and related claims. Merrill Lynch moved to enforce the agreement and compel arbitration in the arbitration system of the New York Stock Exchange.

The district court found no actual bias in the NYSE arbitral forum. Nonetheless, troubled by a perceived tension between the federal policies favoring vindication of civil rights and those favoring arbitration, the court denied the motion to compel. In a thoughtful opinion, the court based its reasoning on two grounds: first, that the 1991 Civil Rights Act ("1991 CRA") amendments to Title VII preclude enforcement of pre-dispute arbitration agreements concerning discrimination claims,[1] and second, that the arbitral forum involved, set up by the rules of the NYSE, was not an adequate forum due to what the district court called "structural bias." *Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 995 F.Supp. 190, 203, 207 (D.Mass.1998).

In the end we agree that the motion to compel was properly denied on the facts of this particular case, but for reasons different than those advanced by the district court. As to the first ground relied on by the district court, we hold as a matter of law that application of pre-dispute arbitration agreements to federal claims arising under Title VII and the ADEA is not precluded by the Older Workers Benefit Protection Act ("OWBPA") amendments to the ADEA or by Title VII as amended by the 1991 CRA. As to the second ground, we disavow the district court's conclusion that the agreement is not enforceable due to "structural bias" in the NYSE arbitral forum, a conclusion that was based on errors of law and fact. We agree that there has been no showing of actual bias in the forum selected and that a refusal to grant a motion to compel arbitration therefore may not be based on that ground.

We nonetheless conclude that there is an independent ground requiring affirmance of the order denying the motion to compel arbitration. The parties have agreed that the essential material facts are undisputed and that this court should, if necessary, resolve an issue not resolved by the district court: whether the parties' agreement met the standard set forth in the 1991 CRA for enforcing arbitration clauses "where appropriate and to the extent authorized by law." We hold, on the facts presented, that this standard was not met, and thus that the motion to compel was properly denied.

## I

Rosenberg, whose prior experience had been in accounting and product engineering, was hired by Merrill Lynch on January 6, 1992. She was forty-five years old and held a Bachelor of Science degree in accounting. She had no experience in the securities industry when she entered Merrill Lynch's twenty-four month training program for financial consultants.

Rosenberg was required to fill out a standardized registration form generally required of employees in the securities industry. That form, the Uniform Application for Securities Industry Registration or Transfer, commonly referred to as the U–4 Form, included the following language under the heading "THE APPLICANT MUST READ THE FOLLOWING VERY CAREFULLY":

> I agree to arbitrate any dispute, claim or controversy that may arise between me and my firm, or a customer, or any other person, that is required to be arbitrated under the rules, constitutions, or by-laws of the organizations indicated in Item 10 as may be amended from time to time and that any arbitration award rendered against me may be entered as a judgement in any court of competent jurisdiction.

Item 10 included boxes for various securities organizations and jurisdictions with which an applicant might be registered. On Rosenberg's form the boxes marked ASE, CBOE, NASD, NYSE, and MA were checked—signifying the American Stock Exchange, Chicago Board of Exchange, National Association of

---

1. Under the rationale of the court's decision, a plaintiff employee who wished to enforce a pre-dispute agreement to arbitrate against a reluc-

tant employer, perhaps out of a desire to save money and time or to preserve privacy, would also be precluded from doing so.

Securities Dealers, New York Stock Exchange, and Massachusetts. The ASE, NASD, and NYSE boxes were apparently checked on or prior to January 10, 1992. The CBOE and MA boxes were checked sometime between January 10 and January 24. Rosenberg's supervisor, John Wyllys, signed the form on January 10, but Rosenberg did not sign the form until January 24—although the form was back-dated to January 10. Rosenberg has no memory of reading or signing the form, although she admits that the signature is hers, and she says that she did not herself check any of the boxes. Wyllys in turn certified that Rosenberg would be familiar with the applicable rules, including the NYSE rules, at the time of approval of her U–4 Form. That certification was untrue.

Rosenberg says that she was not given a copy of the rules, or any amendments to the rules, of the NYSE, the NASD, or any of the other organizations referred to in Item 10 of the U–4. Merrill Lynch does not dispute this claim.

On May 5, 1992, Rosenberg was given the title of Financial Consultant, and she worked for Merrill Lynch until May 2, 1994, when her employment was terminated by John Wyllys. The reason given for the termination was inadequate performance.

Rosenberg alleges that she performed better than at least four male consultants during her two-year tenure, but that she, and not any of them, was terminated in mid–1994. She also says that among those with two years of tenure in her office she was the only consultant who was over age forty.

Rosenberg also alleges that on March 9, 1994, a few months before her termination, John Wyllys sexually harassed her by activating and handing to her a phallus-shaped vibrator when she went into his office to obtain a document. (Wyllys denies this and says the only unusual electrical apparatus in his office was a "stress buster.") Rosenberg did not file a harassment complaint internally with Merrill Lynch.

On April 25, 1994—allegedly the next time Rosenberg and Wyllys spoke—Rosenberg met with Wyllys to discuss her work performance. Wyllys suggested she tender her resignation, saying that her work was not up to expected levels. The next day Rosenberg called Wyllys to invite him to have dinner with her to discuss his evaluation of her, and he accepted the invitation on April 27. At dinner, Rosenberg said she would not resign. Her employment was terminated within days.

## II

In July 1994, Rosenberg filed an administrative complaint with the Massachusetts Commission Against Discrimination ("MCAD") alleging age and gender discrimination. In October 1995, the MCAD found no probable cause. One year later, Rosenberg brought suit in state court asserting discrimination and tort claims against Merrill Lynch and John Wyllys.[2] The defendants removed the case to federal court.

Merrill Lynch moved to compel arbitration and to stay the matter pending arbitration. Merrill Lynch originally moved to compel arbitration in accordance with the rules of the NASD, which Merrill Lynch argued required arbitration "of any dispute, claim, or controversy ... arising out of the employment or termination of employment of associated person(s) with any member [of the NASD]." NASD Manual, Code of Arbitration Procedure Rule 10101 (July 1996). Rosenberg contended that this language was not in force at the time she signed the U–4, and that the NASD rules in effect at that time did not apply to employment claims. Merrill Lynch disputed this, and argued that subsequent modifications of the rules applied to Rosenberg, given the U–4's reference to rules that "may be amended from time to time." Merrill Lynch also argued that regardless of whether the NASD rules required the arbitration of employment disputes, the NYSE Rules clearly did require arbitration of Rosenberg's claim. The district court, however, discussed only the NYSE rules. Merrill Lynch's arguments to this court have similarly focused on the NYSE rules.

2. Both defendants will be referred to as "Merrill Lynch."

The NYSE rules at the time Rosenberg brought her claim required arbitration of all employment disputes. Rule 347 stated:

> Any controversy between a registered representative and any member or member organization arising out of the employment or termination of employment of such registered representative by and with such member or member organization shall be settled by arbitration, at the instance of any such party, in accordance with the arbitration procedure prescribed elsewhere in these rules.

NYSE R. 347. No one explained to Rosenberg that the U–4 Form agreement to arbitrate that she had signed encompassed employment disputes she might have with her employer. She was given a copy of Merrill Lynch's "voluminous" employment handbook, but there is no argument that the handbook states that employment disputes are to be arbitrated.

Rosenberg also said in an affidavit that if she had been informed that her agreement to arbitrate certain claims included any potential employment discrimination claims she would have raised questions and might have sought outside advice. Merrill Lynch responded that the signing of these forms is an absolute condition of employment, or at least was at that time.

The district court initially issued an opinion deferring decision on the motion to stay and ordering "additional briefing and discovery on certain legal issues—the application of *Gilmer* [v. *Interstate/Johnson Lane Corp.*, 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991) ] to the particular statutory schemes at issue here, gender discrimination and sexual harassment under Title VII, age discrimination under ... [the ADEA], the adequacy of the arbitral scheme in the securities industry to enforce gender and age discrimination claims, the legal standard for waiver of the right to an Article III judge and representative jury, and finally, the particular circumstances of waiver in this case." *Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 965 F.Supp. 190, 192 (D.Mass.1997).

Later, the district court denied the motion to compel. *See Rosenberg*, 995 F.Supp. at 212. The court attempted to distinguish the Supreme Court's decision in *Gilmer*, which had held valid a pre-dispute arbitration clause in a U–4 Form signed by a securities industry employee and compelled arbitration of an ADEA claim. The district court reasoned first that in Title VII, in contrast to the ADEA, Congress intended to preclude pre-dispute arbitration clauses, and second, that as a factual matter the NYSE provided an inadequate arbitral forum to vindicate Rosenberg's Title VII and ADEA claims. The forum was inadequate, the court concluded, because of "the extent to which the NYSE arbitration system is dominated by the securities industry, that is, by the employment side of this dispute." *Id.* at 207. The heart of the court's analysis was its conclusion that there was a close identity between Merrill Lynch and the NYSE, that the NYSE dominated the arbitral process, and that the process therefore favored Merrill Lynch. Specifically, the district court found that the Director of Arbitration, an employee of the NYSE, appoints the panel of arbitrators from various pools. Those pools, including the pool of "public arbitrators," are recommended and appointed by the Chairman of the NYSE Board. The Director of Arbitration and his staff also decide some pre-hearing procedural matters. *See id.* at 210–11. The court was concerned with such involvement by NYSE employees, because it found that "Merrill Lynch ... helps govern the NYSE." *Id.* at 210. The district court considered that these deficiencies were not cured by a rule allowing each party to use one peremptory challenge and unlimited challenges for cause to remove arbitrators from the panel.

After the district court's decision, Merrill Lynch abandoned its policy of requiring employees to agree to arbitrate employment discrimination claims; however, this change in policy applies only to claims filed after July 1, 1998, and thus not to Rosenberg. Pursuant to a class action settlement in *Cremin v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, No. 96 C 3773 (N.D.Ill. Sept. 2, 1998), Merrill Lynch has agreed that, regardless of the language of the U–4 Form, employees who file discrimination claims after

July 1, 1998 will be able to bring their claims in court. Employees with discrimination claims filed before that date will still be required to submit their claims to arbitration, but will not be required to do so in the NYSE's arbitration system. Instead, arbitrations will be conducted by outside organizations, before arbitrators who are trained in employment law issues. Rosenberg opted out of the settlement, instead choosing to pursue the case that is before this court. *See id.*

■ The NYSE has proposed a rule change that will exclude employment discrimination claims from the scope of cases to be arbitrated. *See* Self–Regulatory Organizations; Notice of Filing of Proposed Rule Changes by the New York Stock Exchange, Inc. Relating to Arbitration Rules, 63 Fed. Reg. 52,782 (1998). The SEC has yet to approve the change, but it recently approved a similar change in the NASD's rules. *See* Self–Regulatory Organizations; National Association of Securities Dealers, Inc.; Order Granting Approval to Proposed Rule Change Relating to the Arbitration of Employment Discrimination Claims, 63 Fed.Reg. 35,299 (1998).

Rosenberg argues that the NYSE's proposed rule change makes this case moot; the defendants say it is not now moot and will not become moot. Although the rule change may be approved, the proposed rules are silent as to whether the rule change would apply retroactively to existing claims. The NASD rule change was not retroactive. Even if the NYSE rules are changed and

those changes made retroactive and thus Rosenberg cannot be compelled to arbitrate her claims in the NYSE arbitral forum, Merrill Lynch may still be able to compel arbitration in one of the other fora listed on the U–4, including the NASD.[3] This is because the rule change will alter NYSE Rules 347 and 600 to create an exception for employment disputes; the rule change has no effect on the U–4 Form. The issues in this case would apply with equal force to any attempt by Merrill Lynch to compel arbitration in the NASD. Thus, the case is not moot.

## III

### A. *Congressional Intent In Title VII and the OWBPA*

#### 1. *Title VII and Arbitration Agreements*

■ Title VII of the Civil Rights Act of 1964, as amended by the 1991 CRA, does not, as a matter of law, prohibit pre-dispute arbitration agreements, contrary to the holding of the district court. This is a legal issue which we review de novo. *See Bercovitch v. Baldwin School, Inc.,* 133 F.3d 141, 147 (1st Cir.1998).

Whether pre-dispute agreements are prohibited by Title VII is a question of whether Congress intended to preclude their use. It is not a question of resolving the lively current public policy debate about whether use of arbitration, rather than a court, to resolve claims of employment discrimination hinders or advances the vindication of basic civil rights. Good arguments have been made on both sides of this policy debate.[4] The EEOC

---

3. Merrill Lynch has not waived its right to compel arbitration in the NASD arbitration system: Merrill Lynch argued to the district court that it could also compel arbitration in accordance with the NASD rules. Thus this case is not moot.

Any arbitration rules claim based on the NASD claim is resolved by this opinion. Merrill Lynch has not provided any evidence that it gave Rosenberg a copy of the NASD rules, the significance of which we discuss later.

This court urged the parties to attempt to settle this case in light of these developments. They have reported that they are unable to do so.

4. Controversy over mandatory arbitration has grown as the number of employers requiring employees to agree to mandatory arbitration has increased. *See* Bingham, *Employment Arbitra-*

*tion: The Repeat Player Effect,* 1 Employee Rts. & Employment Pol'y J. 189, 189 (1997); Covington, *Employment Arbitration After* Gilmer: *Have Labor Courts Come to the United States?,* 15 Hofstra Lab. & Employment L.J. 345, 345–46 (1998). Critics of the use of arbitration in employment discrimination disputes argue that arbitration procedures are inherently biased against employees, that arbitrators themselves are not neutral or are not trained, that reduced availability of discovery in arbitration favors employers, and that arbitration may limit the availability of certain remedies, especially punitive damages. *See Developments in the Law—Employment Discrimination—Mandatory Arbitration of Statutory Employment Disputes,* 109 Harv. L.Rev. 1670, 1674–75, 1680–82 (1996). Critics also argue that judicial review of arbitration awards is limited, due in

has issued a policy statement discouraging the use of pre-dispute arbitration agreements. *See* EEOC Notice No. 915.002 (July 10, 1997), *reprinted in Excerpts from Text: EEOC Rejects Mandatory Binding Employment Arbitration,* 52 Disp. Resol. J. 11 (1997). Not surprisingly, supporters of arbitration have criticized the EEOC statement. *See, e.g.,* Oppenheimer & Johnstone, *Con: A Management Perspective: Mandatory Arbitration Agreements Are An Effective Alternative to Employment Litigation,* 52 Disp. Resol. J. 19, 19–20 (1997).

In *Gilmer,* the Supreme Court held that the Federal Arbitration Act ("FAA") required the enforcement of the pre-dispute mandatory arbitration clause in a U–4 Form identical to the one signed by Rosenberg. *Gilmer* involved a claim of age discrimination brought under the ADEA. The Court, noting numerous other contexts in which it had held that statutory claims could be the subject of arbitration agreements, ruled that pre-dispute arbitration clauses should be enforced unless the plaintiff could show congressional intent to preclude arbitration. *See Gilmer,* 500 U.S. at 26, 111 S.Ct. 1647. To determine that intent, courts were directed to look to a statute's text and legislative history and to ascertain whether there was a conflict between arbitration and the statute's goals. *See id.*

We find no conflict between the language or purposes of Title VII, as amended, and arbitration. The question of congressional intent in this case is resolved primarily by looking at the language Congress chose to use in the 1991 CRA, which, at section 118, provides:

> [w]here appropriate and to the extent authorized by law, the use of alternative means of dispute resolution, including ... arbitration, is encouraged to resolve disputes arising under the Acts or provisions of Federal law amended by this title.

Civil Rights Act of 1991, Pub.L. No. 102–166, § 118, 105 Stat. 1071, 1081 (1991).

Relying on this language, the district court found that the language and legislative history of section 118 "unambiguously reject mandatory arbitration agreements." *Rosenberg,* 995 F.Supp. at 201. The court focused on the language "where appropriate and to the extent authorized by law." The court acknowledged that Congress passed the 1991 amendments after the Supreme Court's decision in *Gilmer,* but noted that the specific language was drafted prior to the *Gilmer* decision. The court concluded that the legislative history of the amendments made clear that "to the extent authorized by law" referred to the law as it existed prior to *Gilmer,* and thus evidenced congressional "intent to preclude mandatory arbitration." *Id.*

part to the fact that many arbitration decisions are not written. *See id.* at 1682. Although critics of arbitration also argue that compelling arbitration denies employees claiming discrimination of the right to have their claim judged by a jury of their peers, most of the criticisms of arbitration stem from perceptions regarding how arbitration operates in practice, rather than from inherent faults in arbitration.

There are also arguments in favor of arbitration, especially where procedural safeguards are in place. Arbitration may be far less costly than litigation and resolve disputes more quickly. *See* Delikat, *The Siege Continues: Mandatory Arbitration of Employment Claims, in Litigating Employment Discrimination Cases 1998* at 483 (PLI Litig. & Admin. Practice Course Handbook Series No. H0–001C, 1998). Indeed, the number of employment-related cases in the courts has increased dramatically in the past two decades. *See* Bompey et al., *The Attack on Arbitration and Mediation of Employment Disputes,* 13 Lab. Law. 21, 21 (1997). Moreover, arbitration may also allow parties to select arbitrators with expertise

in the subject matter of the dispute. *See id.* at 33; Delikat, *supra.* Each side may also prefer arbitration because of the confidentiality and finality that comes with arbitration. *See* Motley, *Compulsory Arbitration Agreements in Employment Contracts from* Gardner–Denver *to Austin: The Legal Uncertainty and Why Employers Should Choose Not to Use Preemployment Arbitration Agreements,* 51 Vand. L.Rev. 687, 714 (1998); Oppenheimer & Johnstone, *Con: A Management Perspective: Mandatory Arbitration Agreements Are An Effective Alternative to Employment Litigation,* 52 Disp. Resol. J. 19, 22 (1997).

Such benefits may also be attractive to employees. Statistics show that plaintiff employees appear more likely to obtain awards in arbitration than in litigation, albeit with a reduced likelihood of receiving large amounts of damages. *See* Delikat, *supra.* Arbitration advocates also argue that arbitration may improve employee morale by providing an accessible and fair mechanism for resolving disputes. *See* Oppenheimer & Johnstone, *supra,* at 22.

In particular, the court ruled that Congress had intended the revisions to be consistent with *Alexander v. Gardner–Denver Co.*, 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974), in which the Supreme Court held that an arbitration clause in a collective bargaining agreement did not preclude an employee from bringing a Title VII claim in court. *See Rosenberg*, 995 F.Supp. at 201–04.

In reviewing the district court's legal determination, we have the benefit of having construed identical language in the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.* (1994). *See Bercovitch*, 133 F.3d at 150. *Compare* 42 U.S.C. § 12212 (ADA) *with* 105 Stat. at 1081 (1991 CRA). The district court apparently did not consider this court's opinion in *Bercovitch*, which was decided shortly before the district court issued its order refusing to compel Rosenberg to arbitrate her claims. *Bercovitch* held that a plaintiff could be compelled to arbitrate claims brought under the ADA "where the plaintiff had voluntarily signed an agree- ment requiring arbitration." *Bercovitch*, 133 F.3d at 143. Examining the text of the ADA, we found that the statute's language, "far from evidencing an intention to preclude arbitration, can only be interpreted as favoring it." *Id.* at 150. Additionally, language in the Committee Report accompanying the 1991 CRA, cited in Rosenberg's brief as evidence of congressional intent to preclude mandatory arbitration, is identical to language in the Committee Report accompanying the ADA.[5] In *Bercovitch*, however, we found that the legislative history of the ADA did not "rebut the presumption in favor of arbitration" made manifest by the clear language of the statute. *Id.* at 150. We reach the same conclusion here.

Rosenberg and her amici present additional argument that Congress intended to preclude pre-dispute arbitration agreements in the Title VII context.[6] For example, Congress rejected a proposed amendment to the 1991 CRA that would have explicitly permitted pre-dispute mandatory arbitration agree-

---

5. The House Judiciary Committee Report, incorporated by reference into the House Conference Report, discusses the ADA alternative dispute resolution section as follows:

> This section encourages the use of alternative means of dispute resolution, where appropriate and to the extent authorized by law. These methods include ... arbitration.
> ... The Committee wishes to emphasize, however, that the use of alternative dispute resolution mechanisms is intended to supplement, not supplant, the remedies provided by this Act. Thus, for example, the Committee believes that any agreement to submit disputed issues to arbitration, whether in the context of a collective bargaining agreement or in an employment contract, does not preclude the affected person from seeking relief under the enforcement provisions of this Act. This view is consistent with the Supreme Court's interpretation of title VII of the Civil Rights Act of 1964, whose remedial provisions are incorporated by reference in title I. The Committee believes that the approach articulated by the Supreme Court in *Alexander v. Gardner–Denver Co.* applies equally to the ADA and does not intend that the inclusion of Section 513 [the ADA arbitration section] be used to preclude rights and remedies that would otherwise be available to persons with disabilities.

H.R.Rep. No. 101–485(III), at 76–77 (1990), *reprinted in* 1990 U.S.C.C.A.N. 445, 499–500 (footnote omitted).

The House Judiciary Committee Report on the 1991 CRA similarly states:

> This section encourages the use of alternative means of dispute resolution, where appropriate and to the extent authorized by law. These methods include ... arbitration.
> ....
> The Committee emphasizes, however, that the use of alternative dispute resolution mechanisms is intended to supplement, not supplant, the remedies provided by Title VII. Thus, for example, the Committee believes that any agreement to submit disputed issues to arbitration, whether in the context of a collective bargaining agreement or in an employment contract, does not preclude the affected person from seeking relief under the enforcement provisions of Title VII. This view is consistent with the Supreme Court's interpretation of Title VII in *Alexander v. Gardner–Denver Co.*, 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974). The Committee does not intend for the inclusion of this section be used to [sic] preclude rights and remedies that would otherwise be available.

H.R.Rep. No. 102–40(II), at 41 (1991), *reprinted in* 1991 U.S.C.C.A.N. 694, 735.

6. Rosenberg and amicus curiae also attempt to distinguish this case from *Bercovitch* by arguing that here the agreement to arbitrate was not voluntary. Although the question of voluntariness is an important one, it is not relevant to determining whether Congress intended to preclude mandatory arbitration agreements. We consider the question of voluntariness separately below.

ments, and the majority report rejecting the proposed amendment stated that "under the [proposed amendment] employers could refuse to hire workers unless they signed a binding statement waiving all rights to file Title VII complaints" in court and declared that "American workers should not be forced to choose between their jobs and their civil rights." H.R.Rep. No. 102–40(I), at 104 (1991), *reprinted in* 1991 U.S.C.C.A.N. 549, 642. In addition, Rosenberg and her amici point to a statement that section 118 "contemplates the use of voluntary arbitration to resolve specific disputes after they have arisen, not coercive attempts to force employees in advance to forego statutory rights." 137 Cong. Rec. H9505–01, H9530 (daily ed. Nov. 7, 1991) (statement of Rep. Edwards).

Such statements are insufficient to overcome the presumption in favor of arbitration which *Gilmer* establishes. As other amici note in support of Merrill Lynch, additional statements by members of Congress expressed the view that section 118 did not preclude binding arbitration. *See* 137 Cong. Rec. S15,472–01, S15,478 (daily ed. Oct. 30, 1991) (statement of Sen. Dole) ("This provision encourages the use of alternative means of dispute resolution, including binding arbitration, where the parties knowingly and voluntarily elect to use these methods. In light of the litigation crisis facing this country and the increasing sophistication and reliability of alternatives to litigation, there is no reason to disfavor the use of such forums."). Congress has repeatedly rejected legislation that would explicitly bar mandatory agreements to arbitrate employment discrimination claims. *See* Civil Rights Procedures Protection Act of 1997, H.R. 983, S. 63, 105th Cong. (proposing to revise Title VII and the ADEA to state that "[n]otwithstanding any Federal statute of general applicability that would modify any of the powers and procedures expressly applicable to a claim arising under this title, such powers and procedures shall be the exclusive powers and procedures applicable to such claim unless after such claim arises the claimant voluntarily enters into an agreement to resolve such claim through arbitration or another procedure"); Civil Rights Procedures Protection Act of 1996, H.R. 3748, 104th Cong.; Civil Rights Procedures Protection Act of 1994, H.R. 4981, S. 2405, 103d Cong.

Numerous circuit courts have held that the Supreme Court's reasoning in *Gilmer* applies to Title VII claims and that pre-dispute agreements to arbitrate Title VII claims are permissible. *See, e.g., Seus v. John Nuveen & Co.,* 146 F.3d 175, 179, 182–83 (3d Cir. 1998), *cert. denied,* —— U.S. ——, 119 S.Ct. 1028, 143 L.Ed.2d 38 (1999); *Paladino v. Avnet Computer Techs., Inc.,* 134 F.3d 1054, 1062 (11th Cir.1998); *Gibson v. Neighborhood Health Clinics, Inc.,* 121 F.3d 1126, 1130 (7th Cir.1997); *Patterson v. Tenet Healthcare, Inc.,* 113 F.3d 832, 837 (8th Cir. 1997); *Cole v. Burns Int'l Sec. Servs.,* 105 F.3d 1465, 1467–68 (D.C.Cir.1997); *Austin v. Owens–Brockway Glass Container, Inc.,* 78 F.3d 875, 882 (4th Cir.1996); *Metz v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 39 F.3d 1482, 1487 (10th Cir.1994); *Willis v. Dean Witter Reynolds, Inc.,* 948 F.2d 305, 308, 312 (6th Cir.1991); *Alford v. Dean Witter Reynolds, Inc.,* 939 F.2d 229, 230 (5th Cir.1991). Only the Ninth Circuit has disagreed, as described below.

However, few appellate courts, it appears, have dealt with the precise issue of whether the 1991 CRA demonstrates congressional intent to ban pre-dispute agreements to arbitrate employment discrimination claims. In *Duffield v. Robertson Stephens & Co.,* 144 F.3d 1182 (9th Cir.), *cert. denied,* —— U.S. ——, 119 S.Ct. 465, 142 L.Ed.2d 418 (1998), —— U.S. ——, 119 S.Ct. 445, 142 L.Ed.2d 399 (1998) the court refused to enforce the U–4 Form arbitration clause. The *Duffield* court found section 118's statement that arbitration is encouraged "[w]here appropriate and to the extent authorized by law" to be ambiguous, and thus looked to the purposes of the 1991 CRA and to legislative history to elucidate the phrase's meaning. *See id.* at 1198. The court concluded that the legislative history, context, and text of the 1991 CRA demonstrated "that Congress intended to preclude compulsory arbitration of Title VII claims." *Id.* at 1199.

Two courts have, without discussion, held that the 1991 CRA supports enforcement of pre-dispute agreements to arbitrate Title VII claims. *See Patterson,* 113 F.3d at 837 (stating that "the arbitrability of Title VII claims finds support in the Civil Rights Act of 1991"); *Austin,* 78 F.3d at 881 ("The language of the statutes could not be any more clear in showing Congressional favor towards arbitration.").

The Third Circuit has interpreted section 118's reference to "the extent authorized by law" to refer to the Federal Arbitration Act, not to case law as it stood at the time Congress drafted the 1991 CRA. *See Seus,* 146 F.3d at 183 (disagreeing with *Duffield,* 144 F.3d at 1194–98). Like this court in *Bercovitch,* the Third Circuit first looked to the plain meaning of section 118, stating that section 118's endorsement of arbitration "simply cannot be 'interpreted' to mean that the FAA is impliedly repealed with respect to agreements to arbitrate Title VII and ADEA claims that will arise in the future." *See Seus,* 146 F.3d at 182. We agree.

We hold that neither the language of the statute nor the legislative history demonstrates an intent in the 1991 CRA to preclude pre-dispute arbitration agreements. Under *Gilmer,* the remaining question is whether "compulsory arbitration of [Title VII] claims pursuant to arbitration agreements would be inconsistent with the statutory framework and purposes of" Title VII. *Gilmer,* 500 U.S. at 27, 111 S.Ct. 1647 (discussing the ADEA). The district court found that mandatory arbitration would be at odds with the "structure and purpose" of the 1991 CRA and with the 1991 CRA's creation of a right to a jury trial for Title VII plaintiffs. *Rosenberg,* 995 F.Supp. at 204–06.

Resolving this issue requires determining whether there is any meaningful distinction between Title VII, as amended, and either the ADEA, which was construed by the Supreme Court in *Gilmer,* or the ADA, which was construed by this court in *Bercovitch.* *Gilmer* found no clash between arbitration and the purposes of the ADEA, noting instead that "[s]o long as the prospective litigant effectively may vindicate [his or her] statutory cause of action in the arbitral fo-

rum, the statute will continue to serve both its remedial and deterrent function." *Gilmer,* 500 U.S. at 28, 111 S.Ct. 1647 (second alteration in original) (quoting *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 637, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985)) (internal quotation marks omitted). *Bercovitch* held that "[t]here is no reason to think that the ADA presents a stronger policy case against arbitration than [the] ADEA." *Bercovitch,* 133 F.3d at 150.

It is difficult to see why the purposes of Title VII present a stronger case for rejecting arbitration than do the purposes of either the ADEA or the ADA. In finding that it was "not plausible ... that the ... Act would have ... undermined [a plaintiff's private attorney general] role by endorsing private mandatory pre-dispute arbitration agreements," *Rosenberg,* 995 F.Supp. at 205, the district court overlooked *Gilmer* 's statement that public rights may be enforced through arbitration. The district court's comment that an endorsement of arbitration would be at odds with the 1991 CRA's creation of a right to a jury trial, *see id.* at 205–06, similarly ignores *Gilmer* 's endorsement of arbitration under the ADEA—which also provides for jury trials. It may also evince a distrust of arbitration that the Supreme Court has long since disavowed. While people may and do reasonably disagree about whether pre-dispute arbitration agreements are a wise way of resolving discrimination claims, there is no "inherent conflict" between the goals of Title VII and the goals of the FAA, as *Gilmer* used that phrase. *Gilmer,* 500 U.S. at 26, 111 S.Ct. 1647 (quoting *Shearson/American Express, Inc. v. McMahon,* 482 U.S. 220, 227, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987)) (internal quotation marks omitted).

The Supreme Court's very recent decision in *Wright v. Universal Maritime Service Corp.,* —— U.S. ——, 119 S.Ct. 391, 142 L.Ed.2d 361 (1998), reinforces this conclusion. *Wright* addressed the issue of waiver of a judicial forum for ADA claims by virtue of general language in a collective bargaining agreement ("CBA"). The Court did not reach the issue of whether a "clear and unmistakable" waiver in a CBA would be en-

**12**

forced: nor did it take a position on waivers "in areas outside collective bargaining." *Id.* at 396–97 & n. 2. But nothing in the opinion suggests that *Gilmer* is not still good law; rather, the contrary is true.

### 2. *The OWBPA and Arbitration Agreements*

■ Having found that Congress intended to preclude pre-dispute arbitration agreements in the 1991 CRA, the district court did not consider Rosenberg's and amici's argument that the OWBPA independently and explicitly makes pre-dispute arbitration agreements inapplicable to age discrimination claims. The district court apparently felt that *Gilmer* controlled the issue, stating only that "Congress has not clearly expressed its intent to preclude enforcement of pre-dispute arbitration agreements under the ADEA." *Rosenberg*, 995 F.Supp. at 206. We agree with the district court that ADEA claims may be the subject of pre-dispute arbitration agreements, although the issue cannot be resolved by reference to *Gilmer* alone.

Rosenberg and her amici argue that the OWBPA, which the district court did not analyze, provides an alternative ground for upholding the denial of Merrill Lynch's motion to compel arbitration. Congress enacted the OWBPA in 1990. Although the Supreme Court decided *Gilmer* after Congress's passage of the OWBPA, *Gilmer* involved a contract signed prior to the OWBPA, and thus did not consider the effect of the act.[7] Rosenberg signed her U–4 Form in 1992, well after the OWBPA became effective.

As modified by the OWBPA, the ADEA provides:

(1) An individual may not waive any right or claim under this chapter unless the

---

**7.** The *Gilmer* Court did, however, note the "recently enacted" OWBPA. *Gilmer*, 500 U.S. at 29 n. 3, 111 S.Ct. 1647. The OWBPA was not retroactive. *See* Older Workers Benefit Protection Act, Pub.L. No. 101–433, § 202, 104 Stat. 978, 984 (1990).

**8.** The EEOC, in consultation with other agencies, is authorized to promulgate rules under the OWBPA. Section 104 of the OWBPA provides:

waiver is knowing and voluntary. Except as provided in paragraph (2), a waiver may not be considered knowing and voluntary unless at a minimum—

 . . . .

(C) the individual does not waive rights or claims that may arise after the date the waiver is executed[.]

29 U.S.C. § 626(f)(1). Rosenberg and her amici argue that the reference to "waiver" should be interpreted to include the U–4 Form's arbitration clause and that the reference to "right[ ]" should be interpreted to include the right to a bench or jury trial on ADEA claims. Amici point to legislative history that suggests that Congress was particularly concerned about older workers losing the right to a jury trial for ADEA claims. However, the cited language speaks only of ensuring that older workers are able to obtain legal relief and does not mention arbitration or waiver of a judicial forum. *See* S.Rep. No. 101–263, at 31–36 (1990), *reprinted in* 1990 U.S.C.C.A.N. 1509, 1537–1541; H.R.Rep. No. 101–664 (1990), *available in* 1990 WL 200383.

■ The EEOC as amicus curiae argues that its views on the OWBPA are entitled to deference. Yet the EEOC's recently issued rules on the "Waiver of Rights and Claims Under the Age Discrimination in Employment Act" include no discussion of the definition of "right" or "claim," *see* 29 C.F.R. § 1625.22 (effective July 6, 1998), and do not say that "waivers" mean arbitration clauses. We do not defer to views espoused only in the context of litigation. *See Massachusetts v. Blackstone Valley Elec. Co.*, 67 F.3d 981, 991 (1st Cir.1995). This is particularly true where the agency has gone through rule making and has conspicuously ignored the topic in its rules. *See id.*[8]

Notwithstanding section 9 of the Age Discrimination in Employment Act of 1967 (29 U.S.C. § 628), the Equal Employment Opportunity Commission may issue such rules and regulations as the Commission may consider necessary or appropriate for carrying out this title, and the amendments made by this title, only after consultation with the Secretary of the Treasury and the Secretary of Labor.
Older Workers Benefit Protection Act, § 104, 104 Stat. at 981.

Most courts which have considered the issue have interpreted OWBPA's reference to "any right" to apply to substantive rights, or, at any rate, not to the right to proceed in court rather than in arbitration. *See, e.g., Seus,* 146 F.3d at 181–82; *Williams v. Cigna Fin. Advisors, Inc.,* 56 F.3d 656, 660–61 (5th Cir.1995). Courts that have interpreted the OWBPA to apply to waivers of substantive rights have relied in part on dicta in *Gilmer* commenting that "Congress ... did not explicitly preclude arbitration or other nonjudicial resolution of claims, even in its recent amendments to the ADEA." *Gilmer,* 500 U.S. at 29, 111 S.Ct. 1647; *see Seus,* 146 F.3d at 181–82; *Cigna Fin. Advisors,* 56 F.3d at 660–61 ("There is no indication that Congress intended the OWBPA to affect agreements to arbitrate employment disputes."). The recent *Wright* decision reaffirms what was said in *Gilmer:* that an employee's statutory right to a judicial forum for claims of employment discrimination "is not a substantive right." *Wright,* 119 S.Ct. at 396.

Rosenberg and her amici point to the Supreme Court's decision in *Oubre v. Entergy Operations, Inc.,* 522 U.S. 422, 118 S.Ct. 838, 139 L.Ed.2d 849 (1998), in which the Court commented that "[t]he OWBPA implements Congress' policy via a strict, unqualified statutory stricture on waivers, and we are bound to take Congress at its word." *Id.* at 841. These comments are not particularly relevant here because they do not go to the issue of whether the term "waiver" was meant to apply to pre-dispute arbitration agreements. Indeed, while *Oubre* did not consider whether the OWBPA applies to waivers of procedural as well as substantive rights, the Court did state that the OWBPA "is clear: An employee 'may not waive' any *ADEA claim* " unless the requirements of § 626(f) are satisfied. *Id.* (emphasis added). To the degree that *Oubre* has any relevance here, the reference to "claim" suggests that the waiver provisions refer to substantive claims. A substantive ADEA claim may be presented in an arbitral or a judicial forum. *See Gilmer,* 500 U.S. at 28, 111 S.Ct. 1647.

Neither Rosenberg nor amicus curiae the EEOC points to any court that has held that the OWBPA evinces congressional intent to preclude pre-dispute arbitration agreements. The EEOC argues that the *Duffield* court suggested that the OWBPA reference to "right[s]" applies to the right to a judicial forum. However, the *Duffield* court did not consider the issue, merely commenting that "current ADEA claims may require different treatment" from those the Supreme Court considered in *Gilmer. See Duffield,* 144 F.3d at 1190 n. 5.

We hold that Congress did not intend to preclude pre-dispute arbitration agreements when it enacted the OWBPA. Other circuits have noted that:

[i]n enacting the OWBPA, Congress' primary concern was with releases and voluntary separation agreements in which employees were forced to waive their rights.... [T]he OWBPA protects against the waiver of a right or claim, not against the waiver of a judicial forum....

We recognize that Congress, through the OWBPA, has protected terminated employees who waive their substantive rights under ADEA in exchange for a more favorable severance package; however, we find no clear indication that Congress was likewise concerned with protecting employees who agree to arbitrate claims that may arise during the course of their employment.

*Seus,* 146 F.3d at 181 (alterations in original) (quoting *Cigna Fin. Advisors, Inc.,* 56 F.3d at 660–61) (internal quotation marks omitted). Nothing in the language or history of the OWBPA shows an intent impliedly to repeal the FAA for such claims. Congress certainly may act to preclude arbitration, but its failure to do so clearly here means there was no such intent.

To interpret the OWBPA's reference to "right" to include procedural rights—and the right to a judicial forum in particular—would be to ignore the Supreme Court's repeated statements that arbitral and judicial fora are both able to give effect to the policies that underlie legislation. A party who agrees to arbitrate "does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum." *Gilmer,* 500 U.S. at 26, 111 S.Ct. 1647 (quoting *Mitsubishi,* 473

U.S. at 628, 105 S.Ct. 3346) (internal quotation marks omitted). Interpreting the OWB-PA to preclude pre-dispute arbitration agreements would run afoul of the presumption that arbitration provides a fair and adequate mechanism for enforcing statutory rights.

## B. *The New York Stock Exchange's Arbitration System*

In addition to finding that Congress, in enacting the 1991 CRA, had clearly precluded pre-dispute agreements to arbitrate, the district court found an additional ground for refusing to compel arbitration: what it described as "structural bias" in the NYSE's arbitration procedures. The court found that the NYSE arbitration process was "inadequate to vindicate Rosenberg's ADEA and Title VII rights." *Rosenberg,* 995 F.Supp. at 212. In reaching this conclusion, the district court committed two types of errors.

■ First, the district court misinterpreted the window available post-*Gilmer* for challenges to a specific arbitral forum. The district court found no actual bias in the NYSE's arbitration system, but nevertheless refused to compel arbitration due to alleged structural infirmities. Absent a showing of actual bias—and we agree with the district court that there was no such showing in this case—*Gilmer* required the district court to compel arbitration. Second, the district court erred in its description of the NYSE's arbitration procedures.

In *Gilmer,* the Court noted that "the NYSE arbitration rules ... provide protections against biased panels," and held that plaintiff Gilmer had not shown actual bias. *See Gilmer,* 500 U.S. at 30, 111 S.Ct. 1647. The Court rejected arguments that arbitration was inappropriate for ADEA claims due to limitations on discovery and the lack of written opinions. *See id.* at 31–32, 111 S.Ct. 1647. However, *Gilmer* also noted that future plaintiffs might be able to demonstrate "procedural inadequacies ... in specific cases." *Gilmer,* 500 U.S. at 33, 111 S.Ct. 1647.

The district court found that "Rosenberg has risen to the Supreme Court's challenge" to demonstrate that the NYSE arbitration procedures were inadequate to ensure fair adjudication of her claims. *Rosenberg,* 995 F.Supp. at 206. In reaching this conclusion, however, the district court engaged in a generalized inquiry of the sort that *Gilmer* precludes. In particular, the court found that "the NYSE arbitration system is dominated by the securities industry." *Id.* at 207. This conclusion was based on two findings. First, the district court found that Merrill Lynch was a member firm of the NYSE, and that the NYSE's member firms "'govern' the [NYSE] as part of [its] self-regulating scheme." *Id.*

The district court explicitly found that there was no conclusive evidence of bias, either in the manner in which NYSE arbitrations are conducted or in the makeup of the arbitration panels. Limited evidence presented in this case suggests that, if anything, women are more likely to win awards in discrimination claims brought through arbitration than they are in claims brought in court. Evidence submitted in this case also shows that in most discrimination cases brought under the NYSE's arbitration procedures, at least one of the arbitrators is a woman. The NYSE has taken a number of steps since the decision in *Gilmer*—including training arbitrators in employment law and expanding its pool of arbitrators—to make the system fairer than that which the *Gilmer* Court endorsed.

Second, the court found that "[f]rom the rules that govern arbitral procedure, through the selection of the arbitrators, to the details of discovery practice, the system is dominated by the NYSE itself." *Id.* at 210. For instance, "the Chairman of the Board [of the NYSE] recommends and appoints the arbitration pools from which individual arbitrators are chosen, including the pool of non-securities industry 'public' arbitrators," and the NYSE's Director of Arbitration selects "the entire initial panel and any replacements." *Id.* The district court concluded that "[d]ominance of an arbitral system by one side in the dispute does not comport with any model of arbitral impartiality," regardless of the "competence or fairness of individual arbitrators who participate [in] the NYSE system." *Id.* at 211.

The district court misinterpreted certain facts regarding the structure of the NYSE's arbitration system. In particular, the court mischaracterized both Merrill Lynch's role in the NYSE and NYSE arbitration procedures. The district court stated that the majority of NYSE board members were "industry representatives." *Id.* at 207 n. 22. However, representatives of the *securities* industry actually occupy a *minority* of seats on the NYSE's board. In addition, the NYSE is subject to regulation by the SEC, and such regulation includes the NYSE's arbitration procedures. The Supreme Court noted this in *Shearson/American Express, Inc.* when it commented that the SEC possesses "expansive power to ensure the adequacy of the arbitration procedures employed by" self-regulating organizations such as the NYSE. *Shearson/American Express, Inc.*, 482 U.S. at 233, 107 S.Ct. 2332. Rather than being controlled by the securities industry, the NYSE plays a significant role in monitoring and disciplining exchange members for non-compliance with its rules.

The district court also erred in its description of specific arbitration procedures, including its description of the pool of potential arbitrators, and in equating the NYSE's appointment of arbitrators with appointment of arbitrators by a trade association.[9] For example, arbitrators come from a range of organizations and backgrounds. In disputes between NYSE members and non-members, including employment discrimination disputes, "a majority of [the arbitrators] shall not be from the securities industry, unless the ... non-member requests a panel consisting of at least a majority from the securities industry." NYSE R. 607. Additionally, NYSE Rules include a detailed provision prohibiting persons with industry links from serving as public arbitrators. *See Guidelines for Classification of Arbitrators, in* New York Stock Exchange Dep't of Arbitration, *Arbitration Rules* 33, 33 (Sept.1995). Parties to NYSE arbitrations may exercise one peremptory challenge or unlimited challenges for cause against arbitrators. As *Gil-*

*mer* noted, the NYSE's own rules protect against biased panels. *See Gilmer,* 500 U.S. at 30, 111 S.Ct. 1647. Panel members are required to disclose any possible conflicts of interest, and the system is designed to ensure that no Merrill Lynch employee could serve as an arbitrator in an employment dispute brought against the company. *See* NYSE R. 610.

The district court commented that the NYSE "provision for one peremptory challenge and unlimited challenges for cause ... cannot correct the fundamental imbalance in a system in which the entire initial panel and any replacements are appointed by the Director of Arbitration." *Rosenberg,* 995 F.Supp. at 210. However, the Director of Arbitration serves the NYSE, not the securities industry.

■ Rosenberg's supporting amici argue that the NYSE's arbitration procedures are inadequate for Title VII claims because arbitrators often refuse to award statutory attorneys' fees and because plaintiffs are charged forum fees, which may be as high as $3,000 per day and tens of thousands of dollars per case. Amici rely on *Cole,* in which the court held that arbitration agreements requiring plaintiffs to pay forum fees in order to vindicate statutory rights are impermissible. *See Cole,* 105 F.3d at 1484–85.

There are three responses. First, that arbitrators may sometimes do undesirable things in individual cases does not mean the arbitral system is structurally inadequate. Nothing in the choice of arbitration mandates these outcomes, nor are such outcomes necessary concomitants of the NYSE arbitral system. The NYSE rules do not limit available relief. Rule 627 provides that arbitrators may award "damages and/or other relief." NYSE R. 627(e); *see also Gilmer,* 500 U.S. at 32, 111 S.Ct. 1647.

■ The second is that it does not appear to be the usual situation that a plaintiff is asked to bear forum fees. Amici in support of Rosenberg cite arbitration decisions in

---

9. As amicus curiae the NYSE points out, the district court apparently confused the NYSE's Board of Arbitration, which handles disputes among members of the exchange, *see* NYSE R.

632, with the arbitrator pool used for disputes among members, such as Merrill Lynch, and non-members, such as Rosenberg.

which plaintiffs have been required to pay costs. Merrill Lynch replies that the record does not support this claim: in the thirty-three arbitration cases Rosenberg placed in the record, only one plaintiff who prevailed on statutory grounds was denied fees and costs. NYSE arbitrators possess discretion to award costs and fees when they decide a dispute. *Cf. Gilmer*, 500 U.S. at 32, 111 S.Ct. 1647 (stating that "the NYSE rules applicable here do not restrict the types of relief an arbitrator may award"); *Uniform Code of Arbitration* § 30, *in Securities Industry Conference on Arbitration Report # 9*, at 7, 22–24 (June 1996); Securities Indus. Conference on Arbitration, *The Arbitrator's Manual* 29 (Oct.1996) (stating that "[g]enerally, parties to an arbitration are responsible for their personal costs associated with bringing or defending an arbitration action," but noting that exceptions exist, including where there is a statutory basis for attorneys' fees); *id.* at 30, 111 S.Ct. 1647 (stating that although forum fees are required, they may be waived); *see also Kuehner v. Dickinson & Co.*, 84 F.3d 316, 320 (9th Cir.1996) (stating that securities arbitrators "have the full power to provide the legal and equitable remedies available" under statutes). Indeed, in *Cole* the D.C. Circuit enforced an arbitration agreement in part *because* "under NYSE rules and NASD rules, it is standard practice in the securities industry for employers to pay all of the arbitrators' fees. . . . [I]n *Gilmer*, the Supreme Court endorsed a system of arbitration in which employees are not required to pay for the arbitrator assigned to hear their statutory claims." *Cole*, 105 F.3d at 1483–84.

Third, if unreasonable fees were to be imposed on a particular employee, the argument that this was inconsistent with the 1991 CRA could be presented by the employee to the reviewing court. *Cf. Cole*, 105 F.3d at 1485. That issue is not presented by this case. As *Gilmer* said, " 'although judicial scrutiny of arbitration awards necessarily is limited, such review is sufficient to ensure that arbitrators comply with the require-

ments of the statute' at issue." *Gilmer*, 500 U.S. at 32 n. 4, 111 S.Ct. 1647 (quoting *Shearson/American Express, Inc.*, 482 U.S. at 232, 107 S.Ct. 2332).

■ Contrary to Rosenberg's arguments, arbitration is often far more affordable to plaintiffs and defendants alike than is pursuing a claim in court. *Cf. Gilmer*, 500 U.S. at 31, 111 S.Ct. 1647 (noting that although arbitration discovery "procedures might not be as extensive as in the federal courts, by agreeing to arbitrate, a party 'trades the procedures and opportunity for review of the courtroom for the simplicity, informality, and expedition of arbitration'" (quoting *Mitsubishi*, 473 U.S. at 628, 105 S.Ct. 3346)).[10]

*Gilmer* does not mandate enforcement of all arbitration agreements. Plaintiffs are not required to take their claims to biased panels or through biased procedures. But the evidence here establishes no basis to invalidate the NYSE arbitral scheme.

## IV

■ The district court did not reach Rosenberg's arguments that her particular U-4 Form arbitration clause was unenforceable because the contract was an unconscionable adhesion contract, or because her signing of the agreement was not knowing and voluntary or otherwise not within the scope of Congress's intention. *See Rosenberg*, 995 F.Supp. at 212. Rosenberg renews these arguments on appeal. The parties agree that all material facts are before this court and that we should resolve the issue if we reach it. This court possesses the discretion to resolve these issues, as the parties have had a full opportunity to present their arguments to the district court. *See New Hampshire Motor Transp. Ass'n v. Flynn*, 751 F.2d 43, 52 (1st Cir.1984). We reject Rosenberg's argument that the U-4 Form was an unconscionable contract of adhesion. However, on the specific facts presented and under the language of the 1991 CRA, we hold that Rosenberg cannot be compelled to arbitrate her employment discrimination claims

---

10. Rosenberg and amici make additional arguments regarding the alleged inadequacy of the NYSE's arbitration procedures. In particular, they argue that NYSE arbitrators are not obligat-

ed to follow the law and that a lack of written decisions makes review difficult. *Gilmer* disposes of these arguments. *See Gilmer,* 500 U.S. at 31–32, 111 S.Ct. 1647.

against Merrill Lynch.[11] Our resolution of this case has no bearing whatsoever on the enforceability of agreements to arbitrate consumer disputes. In addition, nothing in this opinion concerns the enforceability of provisions of the U–4 Form or the NYSE Rules not related to the arbitration of employment discrimination disputes.

### A. Was Rosenberg's Agreement to Arbitrate Invalid Because It Was An Unconscionable Contract of Adhesion?

■■■ Rosenberg and amici argue that the arbitration agreement should not be enforced because it is unconscionable and because it is the result of a gross disparity of bargaining power. We reject these arguments, which are not frivolous, because the law has long imposed a heavy burden on those who make such arguments and Rosenberg has not met her burden of proof.

The district court found that signing the U–4 Form was a prerequisite for employment as a securities broker, and Merrill Lynch has acknowledged that it would not "employ or promote financial consultants who refuse to sign the Form U–4." Securities industry officials similarly confirmed that financial consultants were not permitted to excise the arbitration clause from the U–4 Form. Rosenberg argues that the imposition of such a requirement renders the U–4 Form arbitration clause invalid as an unenforceable contract of adhesion.

We agree with the Third Circuit that the U–4 Form arbitration clause is not unenforceable on these grounds. See Seus, 146 F.3d at 184. In Seus, the court found that even if the U–4 Form arbitration agreement were a contract of adhesion plaintiff would still need to show "both a lack of meaningful choice about whether to accept the provision in question, and that the disputed provisions were so onesided as to be oppressive." Id. (quoting Stebok v. American Gen. Life & Accident Ins. Co., 715 F.Supp. 711, 714 (W.D.Pa.), aff'd, 888 F.2d 1382 (3d Cir.1989)) (internal quotation marks omitted). And section 211 of the Restatement (Second) of Contracts states that a term in a standardized agreement is enforceable unless one party "has reason to believe that the party manifesting . . . assent would not do so if he knew that the writing contained a particular term." Restatement (Second) of Contracts § 211 (1979); see also Waters v. Min Ltd., 412 Mass. 64, 587 N.E.2d 231, 233 (1992) ("Unconscionability must be determined on a case-by-case basis, with particular attention to whether the challenged provision could result in oppression and unfair surprise to the disadvantaged party and not to allocation of risk because of 'superior bargaining power.'" (quoting Zapatha v. Dairy Mart, Inc., 381 Mass. 284, 408 N.E.2d 1370, 1375 (1980))). Rosenberg has made no such showing.

In addition, in Gilmer, the Court stated that inequality in bargaining power "is not a sufficient reason to hold that arbitration agreements are never enforceable in the employment context." Gilmer, 500 U.S. at 33, 111 S.Ct. 1647. Gilmer, after all, involved the same U–4 Form arbitration clause at issue here. Absent a showing of fraud or oppressive conduct—which Rosenberg does not allege occurred—the contract is not unenforceable on these grounds.[12]

### B. Was Rosenberg's Agreement to Arbitrate Appropriate and Authorized By Law Within the Meaning of the 1991 CRA?

■■■ We repeat what Rosenberg's U–4 Form said and did not say. The U–4 Form

---

11. No claim is made that the agreement is unenforceable because it falls within the FAA exclusion for "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1; see also Gilmer, 500 U.S. at 25 n. 2, 111 S.Ct. 1647 (discussing this provision); Dickstein v. duPont, 443 F.2d 783, 785 (1st Cir.1971); Estreicher, Predispute Agreements to Arbitrate Statutory Employment Claims, 72 N.Y.U. L.Rev. 1344, 1363–72 (1997).

12. We also reject arguments from amici that the compulsory arbitration of Title VII claims imposes an "unreasonable restriction on the right to earn a living," and that the SEC's involvement in approving the NYSE rules triggers unconstitutional conditions doctrine. These claims are utterly without merit. See Desiderio v. National Ass'n of Sec. Dealers, Inc., 2 F.Supp.2d 516, 519 & n. 2 (S.D.N.Y.1998) (finding that the NASD is not a state actor); Cremin v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 957 F.Supp. 1460, 1466 (N.D.Ill.1997) (rejecting claims similar to those of amici curiae in this case).

stated that Rosenberg agreed to arbitrate "any dispute, claim or controversy that may arise ... *that is required to be arbitrated under the rules, constitutions, or by-laws of the organizations indicated in Item 10*" (emphasis added). The agreement did not state that Rosenberg agreed to arbitrate *all* disputes, or even *any* dispute. The agreement only required Rosenberg to arbitrate any dispute that the NYSE's rules, constitution, or bylaws (or those of any of the organizations listed in item 10) required to be arbitrated. *Cf. Prudential Ins. Co. of America v. Lai*, 42 F.3d 1299, 1302 (9th Cir.1994) (noting that the U–4 Form arbitration provision "does not in and of itself bind appellants to arbitrate any particular dispute"). It is undisputed that Rosenberg's execution of this provision was a condition of her employment with Merrill Lynch.

The NYSE Rules in turn required Rosenberg to arbitrate "[a]ny controversy ... arising out of [her] employment or termination of [her] employment." NYSE R. 347. Merrill Lynch does not dispute Rosenberg's statement that she never received a copy of the NYSE rules and has provided no evidence that it gave her a copy or made one available to Rosenberg at the time of the employment, at the time of NYSE approval, or even later. Nor has Merrill Lynch provided evidence it even told Rosenberg that the clause required her to arbitrate any employment discrimination claims. Had the U–4 provided for arbitration of *all* disputes, or given explicit notice that employment disputes were subject to arbitration, we would have had little difficulty in finding that Rosenberg had agreed to arbitrate her employment discrimination claims within the meaning of the 1991 CRA.

For purposes of the 1991 CRA, the parties and the district court have adopted the analytical rubric of whether the agreement was "knowing and voluntary" to examine the agreement.[13] This usage is common, *see, e.g., Bercovitch*, 133 F.3d at 151 (dicta), and stems from a footnote in *Gardner–Denver*:

> In determining the effectiveness of any such waiver, a court would have to determine at the outset that the em-

ployee's consent ... was voluntary and knowing.

*Gardner–Denver*, 415 U.S. at 52 n. 15, 94 S.Ct. 1011.

The "knowing and voluntary" language undoubtedly comes from thinking of arbitration as "a *waiver* of judicial remedies." *Mitsubishi*, 473 U.S. at 628, 105 S.Ct. 3346 (emphasis added). It is commonplace that waivers of certain rights, particularly substantive rights, are enforceable only if they are knowing and voluntary. Whether a standard similar to the one that applies to rights such as the right to counsel, *cf. Johnson v. Zerbst*, 304 U.S. 458, 465, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), should apply to waivers of a judicial forum is an open question.

As the Seventh Circuit has noted, if this "knowing and voluntary" standard is meant to add another layer of protection for the employee, then it is "[l]ess clear ... whether the right to have one's federal claims determined judicially rather than in an arbitration proceeding qualifies for this added protection." *Gibson*, 121 F.3d at 1129. On this issue of whether there is a heightened level of protection the circuits are split. The Supreme Court has not directly decided the issue.

The Ninth Circuit has expressly adopted a "knowing" standard for such arbitration clauses and has described the standard as being a heightened one. *See Renteria v. Prudential Ins. Co. of America*, 113 F.3d 1104, 1105–06 (9th Cir.1997); *Lai*, 42 F.3d at 1305. The Third Circuit has rejected any heightened standard. *See Seus*, 146 F.3d at 183–84 & n. 2. The Eighth Circuit appears to have done the same in *Patterson*. *See Patterson*, 113 F.3d at 838. The Seventh Circuit recognized the issue in *Gibson*, but found it unnecessary to resolve it. *Gibson*, 121 F.3d at 1130.

We also find it unnecessary to resolve this general issue. Rather, we focus on the language of the 1991 CRA, in which the terms "knowing and voluntary" do not appear. The operative language is:

> [w]here appropriate and to the extent authorized by law, ... arbitration ... is en-

---

**13.** *Cf.* Estreicher, *supra,* at 1346; *Developments* in the Law, supra, at 1677–78.

couraged to resolve disputes arising under [these laws].

1991 CRA § 118, 105 Stat. at 1081. There has been little case law on the meaning of these terms.

At a minimum the words "to the extent authorized by law" must mean that arbitration agreements that are unenforceable under the FAA are also unenforceable when applied to claims under Title VII and the ADEA. Under the FAA, arbitration agreements are enforceable "save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. In *Mitsubishi*, the Court gave an example of the sorts of agreements which are unenforceable under the FAA:

> Of course, courts should remain attuned to well-supported claims that the agreement to arbitrate resulted from the sort of fraud or overwhelming economic power that would provide grounds "for the revocation of any contract."

*Mitsubishi*, 473 U.S. at 627, 105 S.Ct. 3346 (quoting 9 U.S.C. § 2). The question under the FAA of whether an arbitration agreement is enforceable is generally determined by reference to common-law principles of general applicability. *See Perry v. Thomas*, 482 U.S. 483, 492 n. 9, 107 S.Ct. 2520, 96 L.Ed.2d 426 (1987); *Southland Corp. v. Keating*, 465 U.S. 1, 19–20, 104 S.Ct. 852, 79 L.Ed.2d 1 (1984). When deciding whether the parties agreed under the FAA to arbitrate a certain matter, courts "generally . . . should apply ordinary state-law principles that govern the formation of contracts." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995).[14]

Similarly, the question of the scope of an arbitration agreement under the FAA is a matter not just of state law, but of general federal arbitration law. *See Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983). There is often, as here, a predecessor question of whether there was an agreement at all to arbitrate. *See MCI Telecomms. Corp. v. Exalon Indus., Inc.*, 138 F.3d 426, 428–29 (1st Cir.1998). Reference should be made to standard principles of contract law in making such a determination. *See id.* at 429–30. We need not resolve here whether the "to the extent authorized by law" clause has a meaning greater than a reference to the FAA.

While such principles provide background, the resolution of the case does not turn on them but on the language of the 1991 CRA; that is, whether under these facts, the arbitration clause was "appropriate." Thus, this case does not implicate any broader questions of enforceability of the arbitration clause when the 1991 CRA or ADEA are not involved.

We set the context. Rosenberg's and Merrill Lynch's arbitration agreement did not by itself define the range of claims subject to arbitration, even though Merrill Lynch expressly represented that she would be advised of the rules. It referred only to arbitration of such claims as were required to be arbitrated by the NYSE rules. But those rules were not given to Rosenberg or described to her.[15] The question then becomes which party should bear the risk of her ignorance. Given Congress's concern that agreements to arbitrate employment discrimination claims should be enforced only where "appropriate," a concern not expressed in the FAA or at common law, Merrill Lynch should, we believe, bear that risk.[16]

---

**14.** There is no contention here that the parties agreed that an arbitrator should decide questions of arbitrability; the parties contend that the issue is for this court. In any event, Rosenberg did not clearly agree to submit the questions of arbitrability to an arbitrator, and so the issue is indeed for the court. *See First Options*, 514 U.S. at 944–45, 115 S.Ct. 1920.

**15.** Merrill Lynch argues that we have before us a complete record, and acknowledges that it "had a full opportunity to argue the issue [of the validity of the contract] below." The district

court explicitly invited the parties to provide "additional briefing and discovery" on "the particular circumstances of waiver in this case." *Rosenberg*, 965 F.Supp. at 192. Merrill Lynch has never argued that Rosenberg either was given or had access to the rules. Rosenberg's claim that she never received the rules is thus not in dispute.

**16.** It may be argued that other doctrines of contract law, not directly applicable here, also support placing the risk on Merrill Lynch. Although adhesion contracts are generally enforceable,

As part of its employment agreement with Rosenberg, Merrill Lynch required her to agree to the terms of the U–4 Form. The U–4 Form, prepared under the NYSE Rules, requires that employees being asked to execute the U–4 Form be given a copy of the NYSE rules or information to the same effect, at least by the time of approval. The U–4 Form thus explicitly contemplated that Merrill Lynch would take the steps necessary to ensure that Rosenberg was aware of the NYSE rules. The same U–4 Form that Rosenberg signed to register with the NYSE was also signed by John Wyllys on behalf of Merrill Lynch. Under the heading, "THE FIRM MUST COMPLETE THE FOLLOWING," the U–4 Form stated:

> To the best of my knowledge and belief, the applicant is currently bonded where required, and, at the time of approval, will be familiar with the statute(s), constitutions(s), rules and by-laws of the agency, jurisdiction or self-regulatory organization with which this application is being filed, and the rules governing registered persons, and will be fully qualified for the position for which application is being made herein.

Wyllys' signature follows this statement. But Wyllys' certification was false: Merrill Lynch never provided Rosenberg with a copy of the rules and Merrill Lynch has provided no evidence it made Rosenberg familiar with the rules as to arbitration. Merrill Lynch's failure runs afoul of the mutual understandings. Since the arbitration requirement stems from the NYSE Rules and the U–4 Form requires that the employee be "familiar with" the rules and thus with the requirement for arbitration of employment claims, we think that Merrill Lynch's inaction undercuts the imposition of an arbitration requirement. *See Dickstein v. duPont*, 443 F.2d

783, 784 (1st Cir.1971) (stating that the predecessor to the U–4 Form "was an integral and mutually binding part of [the] employment arrangement" between an employee and a NYSE brokerage house). The NYSE rules contemplated that Merrill Lynch certify to it that, at least as of the time of NYSE approval of Rosenberg's application, Rosenberg be "familiar" with the rules including the rules that all employment disputes be arbitrated. Merrill Lynch's failure, we believe, makes it inappropriate to enforce the provision.

This holding is in accordance with *Ramirez–De–Arellano v. American Airlines, Inc.*, 133 F.3d 89 (1st Cir.1997), an employee handbook case in which this court suggested that an agreement to "waive the right to a judicial forum for civil rights claims, . . . in exchange for employment or continued employment, must at least be express." *Id.* at 91 n. 2 (quoting *Nelson v. Cyprus Bagdad Copper Corp.*, 119 F.3d 756, 761–62 (9th Cir. 1997), *cert. denied* —— U.S. ——, 118 S.Ct. 1511, 140 L.Ed.2d 665 (1998)) (internal quotation marks omitted); *see also Paladino*, 134 F.3d at 1059, 1062 (refusing to enforce the arbitration of Title VII claims, one judge on the ground that the language of the arbitration clause did not provide fair notice, and two judges on the ground that the clause foreclosed Title VII remedies and may have required the claimant to bear hefty arbitration fees).

 In short, under these circumstances, compelling arbitration would not be "appropriate" under the 1991 CRA. Our approach is close to that taken by the Supreme Court in *Wright*. There the court declined to mandate arbitration of an ADA claim where the waiver of a judicial forum set forth in a CBA was not "clear and unmistakable." *Wright*, 119 S.Ct. at 396–97. To be sure, *Wright*

---

they "are construed strictly against the drafter." 17 R. Bishop, *Massachusetts Practice*, § 2.2, at 15 (4th ed.1997). Merrill Lynch did not draft the U–4 Form, but in requiring that Rosenberg sign the U–4 Form as a condition of employment Merrill Lynch was clearly assuming the role of drafting party. This rule of interpretation is particularly relevant here, where Rosenberg had no ability to choose or even negotiate the terms of the arbitration agreement. ● While the contract is not sufficiently explicit to put Rosenberg on no-

tice, even on its own terms, rather than being ambiguous, the risk of that non-explicitness should be on Merrill Lynch just as the risk of ambiguity is on the drafting party. *Cf. Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 62, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995) (noting the "common-law rule of contract interpretation that a court should construe ambiguous language against the interest of the party that drafted it"). We do not, however, decide the case on common law contract grounds.

carefully distinguished a private arbitration agreement from an agreement in the collective bargaining context. *See id.* at 397 n. 2. There are sound reasons to recognize such a distinction and a lesser standard than "clear and unmistakable" applies to private agreements. *See id.* at 396. But *Wright* also teaches that the "appropriate" language of the 1991 CRA, which parallels that of the ADA, has some teeth:

> Our conclusion that a union waiver of employee rights to a federal judicial forum for employment discrimination claims must be clear and unmistakable means that, absent a clear waiver, it is not 'appropriate' . . . to find an agreement to arbitrate.

*Id.* at 397 n. 2. In recognizing that "the right to a federal judicial forum is of sufficient importance to be protected," *id.* at 396, *Wright* leads to the conclusion, we think, that there be some minimal level of notice to the employee that statutory claims are subject to arbitration.[17]

## V

This case requires applying the Supreme Court's holding in *Gilmer* to Title VII as amended by the 1991 CRA and the ADEA as amended by the OWBPA. This case does not involve evaluation of the policies in favor of and against litigation as opposed to arbitration. We hold that there was no congressional intent to preclude pre-dispute arbitration agreements manifested in the 1991 CRA or the OWBPA. We also hold that the evidence does not support a finding that there is "structural bias" or that the NYSE arbitral rules create "procedural inadequacies" sufficient to be an exception to *Gilmer.* Our holding here that Rosenberg cannot be compelled to arbitrate her claims is limited. As stated above, had Merrill Lynch taken the modest effort required to make relevant information regarding the arbitrability of em-

ployment disputes available to Rosenberg as it committed itself to do, it would have been able to compel Rosenberg to arbitration. This case does not concern the enforceability of Form U–4 arbitration agreements with customers. Nor does it concern the enforceability of employment disputes where the claims involved are not employment discrimination claims under the federal civil rights laws.

*Affirmed.*

Costs to Rosenberg.

WELLFORD, Senior Circuit Judge, concurring in part and dissenting in part.

I concur entirely with Judge Lynch's excellent analysis of the issues in this case and in her opinion on those issues set out in Parts I, II and III, which reverse the decision of the district court. Furthermore, I concur in Part IVA of Judge Lynch's analysis concerning whether the contract involved was an unenforceable, "unconscionable adhesion contract." Rosenberg's agreement to arbitrate was not invalid, and this case is not moot.

In general, I concur with the conclusion that *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991), is still good law and applies to the issues in this controversy. The rationale of *Bercovitch v. Baldwin School, Inc.*, 133 F.3d 141 (1st Cir.1998), is also persuasive on the claims presented by Rosenberg, as is *Seus v. John Nuveen & Co.*, 146 F.3d 175 (3d Cir.1998). *See also Patterson v. Tenet Healthcare, Inc.*, 113 F.3d 832 (8th Cir.1997). I also agree with the rejection of *Duffield v. Robertson Stephens & Co.*, 144 F.3d 1182 (9th Cir.), *cert. denied,* —— U.S. ——, 119 S.Ct. 445, 142 L.Ed.2d 399 (1998), as unpersuasive. I would, in short,

---

**17.** If Merrill Lynch had provided the rules to Rosenberg but she did not read them, that would not save her. *See Tiffany v. Sturbridge Camping Club, Inc.*, 32 Mass.App.Ct. 173, 587 N.E.2d 238, 240 n. 5 (1992) (stating the traditional rule of contract law that a party to a contract is assumed to have read and understood the terms of a contract she signs). This opinion also does not suggest utilization of a subjective standard which focuses on what the employee actually knew.

*But cf. Developments in the Law, supra,* at 1683–84 (arguing for such a standard). Indeed, it would be an odd result if the 1991 CRA were to be interpreted based on the assumption that women and minorities, otherwise competent to enter contracts, were somehow disabled and in need of such special protections where the subject of the contract was an agreement to arbitrate.

like Judge Lynch, reject the reasoning of the district court in this case.

I write separately, however, in respectful disagreement with the conclusions in Part IVB.[1] The analysis concerning non-enforcement of the parties' agreement, because not "appropriate and authorized by law" under CRA, is my point of departure in this difficult case.

There are a number of facts that cut against the result reached by Judge Lynch's opinion. First, the district court found Rosenberg to be a mature, well-educated businesswoman when she began her career as a financial consultant with Merrill Lynch. Second, discovery in this case was not even completed before defendant moved to compel arbitration under the U–4 agreement and applicable exchange/securities rules. Third, in denying the motion, the district court found that Rosenberg signed the agreement, but allegedly did not receive any applicable exchange rules. She asserted that she was not advised of, and was ignorant about, the arbitration documents. The district court, however, makes no reference to Merrill Lynch's position *vis-a-vis* furnishing advice, documentation, or information to Rosenberg at or before—or after—Rosenberg signed the agreement to arbitrate. Judge Lynch notes that Merrill Lynch "does not dispute" that Rosenberg was not given a copy of applicable rules of any organization referred to in Item 10 of U–4, but I do not conclude from the available record that Merrill Lynch concedes that a copy of the rules was not available to her at all pertinent times upon request. Nowhere in the record do I find a contention that Rosenberg asked about such rules or sought advice or information from Merrill Lynch about the meaning and effect of the U–4 agreement which she signed. We do not know what, if anything, Merrill Lynch's representatives did, said or furnished Rosenberg in connection with the arbitration agreement, and/or in response to any inquiry or actions of Rosenberg regarding the said agreement.

I would find the arbitration clause in question not to be "inappropriate" as to the issues in this case. Congress, in using the expression "[w]here [arbitration is] appropriate" may well have intended some threshold determination that the type of employee-employer dispute be amenable to resolution by arbitration. The Supreme Court in *Wright v. Universal Maritime Serv. Corp.,* —— U.S. ——, 119 S.Ct. 391, 142 L.Ed.2d 361 (1998), interpreted the "[w]here appropriate and to the extent authorized by law" language of the Civil Rights Act as a single unit in deciding that a collective bargaining agreement negotiated by a union would not be enforced against an affected employee under the circumstances of that case. That situation was different from the private employee-employer agreement here involved. *Wright* limited its holding to the context where a labor union waived a member's federal statutory rights.

The form signed by Rosenberg indicated an agreement to arbitrate and directed her to read the agreement carefully with specific reference to New York Stock Exchange Rules. Under all the circumstances, I would be inclined to remand to the district court to develop fully the facts as to whether Rosenberg was afforded a reasonable opportunity to appreciate the arbitration implications of her employment agreement. Did she have an opportunity to be familiar, or did she have a duty to familiarize herself, with the arbitration undertaking?

I do not consider *Ramirez–De–Arellano v. American Airlines, Inc.,* 133 F.3d 89 (1st Cir.1997), to support the majority view. *Ramirez* was an action "brought primarily under the Fair Labor Standards Act (FLSA) and Puerto Rico law." *Id.* at 89. It did not involve a civil rights claim, and the court upheld summary judgment for defendant in the discharge of plaintiff. The *Ramirez* court simply held that plaintiff could pursue his action in federal court because of the court's dissatisfaction with aspects of American Airlines' arbitration procedures not akin to those involved in the instant dispute.

More important, however, is my disagreement with Judge Lynch's conclusion in part IVB that arbitration would not be "appropri-

---

1. However, I would agree with Judge Lynch's finding in footnote 14 that the issue of arbitrability and the scope of the agreement is for this court and not the arbitrator.

ate" because, as plaintiff avers, Merrill Lynch did not furnish Rosenberg with a copy of the pertinent rules, and because Merrill Lynch falsely certified that Rosenberg was "familiar with" the rules.

I am reluctant to join a finding that Merrill Lynch, and/or its representative, John Wyllys, falsely certified Rosenberg's qualifications, fitness, and knowledge as a financial representative and her familiarity with the rules. Even assuming, however, that the certification was incorrect, I disagree with the conclusion reached in Part IVB.

Unlike Judge Lynch, I would hold that Rosenberg was presumed to understand, and to be bound by, the plain terms of her U–4 agreement even if she were not furnished copies of the exchange rules at the time of signing. I believe the agreement was broad and plain and that it put Rosenberg on notice that she agreed to arbitrate at the outset "any dispute, claim or controversy" with Merrill Lynch under exchange rules.[2] If she "did not make herself aware of the existence or scope of [the arbitration] clause [in the U–4 agreement], she did so at her own peril." *Beauchamp v. Great West Life Assur. Co.,* 918 F.Supp. 1091, 1099 (E.D.Mich.1996). She is "presumed to know the contents of the signed agreement" as well as its reasonable import. *Cremin v. Merrill Lynch Pierce,* 957 F.Supp. 1460, 1477 (N.D.Ill.1997) (citing *Beauchamp,* 918 F.Supp. at 1097–98).

*Ludwig v. Equitable Life Assurance Society of the U.S.,* 978 F.Supp. 1379, 1382 (D.Kan. 1997), puts it even more specifically under facts and contentions similar to those in this case: "regardless of whether plaintiff received the NASD Code, the potential breadth of the arbitration provision immediately put her on notice that any and all employment disputes were subject to mandatory arbitration." *Id.* at 1382; *see also Herko v. Metropolitan Life Ins. Co.,* 978 F.Supp. 141, 147 (W.D.N.Y.1997).

All these district court cases cited herein involve agreements and contentions by plaintiffs similar to those made in this case by Rosenberg. I would hold to the presump-

tion, in light of these authorities, that Rosenberg was put on notice and should have made prompt inquiry in connection with her executing the arbitration agreement as to the scope and nature of the exchange rules.

I would therefore REVERSE and grant the defendant's motion for arbitration.

---

**2.** I would not add as a part of our inquiry in this case any heightened standard in determining whether or not Rosenberg's agreement, under the circumstances, was a voluntary and knowing one. *See Seus,* 146 F.3d at 183–84 and n. 2, and also *Patterson,* 113 F.3d at 838.