Yvonne BOATENG, Plaintiff,

v.

**GENERAL DYNAMICS CORPORATION** and **General Dynamics Armament and Technical Products, Inc.,** **Defendants.**

Civil Action No. 05–40222–FDS.

United States District Court,
D. Massachusetts.

Jan. 26, 2007.

David H. Gibbs, Bowditch & Dewey LLP, Boston, MA, Ryan T. Killman, Bowditch & Dewey LLP, Worcester, MA, for Defendants.

Harold James Hartley, James E. O'Connell, Barbara A. Robb, Shilepsky O'Connell Casey Hartley Michon Yelen, LLP, Boston, MA, for Plaintiff.

## MEMORANDUM AND ORDER ON DEFENDANTS' MOTION TO DISMISS, OR IN THE ALTERNATIVE, TO COMPEL ARBITRATION AND TO STAY LITIGATION

SAYLOR, District Judge.

This is an action alleging unlawful race discrimination and retaliation in violation of 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, and intentional and negligent misrepresentation. Plaintiff Yvonne Boateng contends that her employer, defendant General Dynamics Armament and Technical Products, Inc. ("GDATP"), unlawfully lowered her performance rating, deprived her of salary increases, and ultimately terminated her because of her race and in retaliation for exercising her protected rights under Title VII.

The issue before the Court is whether this dispute is subject to arbitration. Defendants GDATP and General Dynamics Corporation have moved to dismiss, or in the alternative, to compel arbitration and to stay litigation. Defendants contend that when Boateng was hired, she signed an agreement requiring that disputes such as this be submitted to binding arbitration. For the reasons stated below, the Court agrees that this matter is subject to that agreement and should be arbitrated. Accordingly, defendants' motion to compel arbitration and stay litigation will be granted and the motion to dismiss will be denied.

### I. *Factual Background*

GDATP designs, develops, and produces products for the United States Department of Defense and for the ministries of defense of many foreign nations. It has

been headquartered in Charlotte, North Carolina, since September 2003. Prior to that time, GDATP was headquartered in Burlington, Vermont. GDATP is a wholly owned subsidiary of General Dynamics Corporation, which has its headquarters in Falls Church, Virginia.

Boateng, an African–American female, began interviewing for a tax manager position with GDATP in August 2002. She received an offer of employment in October 2002. According to the offer letter, the offer was contingent upon a number of requirements, including execution of a Dispute Resolution Policy Agreement.

### A. *GDATP's Dispute Resolution Policy*

In July 2001, prior to Boateng's employment, GDATP instituted a Dispute Resolution Policy (the "Policy"). The Policy is binding on both GDATP and its employees, and establishes procedures for the resolution of employment disputes. Specifically, it mandates a four-step process for dispute resolution: (1) human resources review; (2) management review; (3) mediation; and (4) arbitration.

The parties dispute whether a copy of the Policy was provided to Boateng. According to defendants, a copy of the Policy was included in her offer letter in October 2002. Boateng does not deny having received a copy, but states that she does not "recall" whether she did. Defendants further contend that Boateng received a copy of the Policy with her orientation materials when she began work; and that she was told at the same time that she could access the Policy on the company's intranet system. They also contend that in 2003, when the Policy was amended, copies of the amended Policy were provided to her via e-mail and a letter sent to her home. Plaintiff again does not deny those contentions, but states that she does not "recall"

being informed of, or receiving a copy of, the Policy on any of those occasions.

In any event, Boateng signed a Dispute Resolution Policy Agreement (the "Agreement") on October 11, 2002, by which she agreed to resolve all claims arising out of her application for employment, employment, or termination of employment by the terms of the Policy. The Agreement also indicated that Boateng waived her right to jury trial and to file a lawsuit, except to enforce the terms of the Agreement.

### B. *Boateng's Job Performance*

Boateng began working as a tax manager at GDATP's headquarters in Burlington in November 2002. She states that throughout her tenure at the Burlington office, she maintained her Massachusetts residence, staying in Burlington during the work week and returning to her home in Northborough, Massachusetts, for weekends, holidays, and vacations.

In her amended complaint, Boateng alleges that she "performed her job extremely well." She alleges that her supervisors' written appraisal of her 2003 job performance gave her an overall grade of "2," which meant "excellent." However, she also alleges that her performance and the accompanying recognition by her superiors were not well-received by Lawrence Friedman, the General Dynamics Land Systems Tax Manager. Friedman is a white male who resides in Sterling Heights, Michigan. The amended complaint includes several allegations regarding attempts by Friedman to belittle Boateng and to undermine her work.

### C. *Alleged Racially–Motivated Comments by Friedman*

According to Boateng, the racial motivation behind Friedman's comments and actions was revealed in June 2004. Boateng's direct supervisor, Peter Haskell,

had asked her to travel to Michigan to meet with Friedman on June 28, 2004, because Friedman had purportedly expressed dissatisfaction with a draft tax return she had previously submitted. She alleges that when she arrived in Michigan, Friedman engaged in a public and discriminatory attack on her, allegedly stating: "I did not want your kind here"; "General Dynamics management is not suited to your kind"; "I have been here for 25 years, you are not going to get ahead of me"; and "you are not worth the pay you get." He also allegedly stated: "I'm from Missouri, and we own cattle there. The way a farm works, what the farmer says goes!"

## D. *Relocation to North Carolina*

According to Boateng, as of June 2004 she was in the process of selling her home in Massachusetts and preparing to move to GDATP's new headquarters in North Carolina. Following the June 28 incident with Friedman, she informed Haskell that, in light of his discriminatory and harassing treatment, she was no longer willing to sell her home and relocate. She alleges that Haskell and other GDATP employees assured her that the situation would be remedied and that she would not have to work for or report to Friedman. She relocated to North Carolina in reliance on those representations.

## E. *Boateng's 2004 Performance Evaluation*

Boateng's 2004 job performance evaluation, which she received in March 2005, resulted in an overall rating of "4," which meant "needs improvement." Boateng contends that Friedman was involved in the evaluation process and that is why she received a lower rating. She alleges that, as a result of this lower rating, she was denied a bonus for 2004 and a raise for 2005.

## F. *Boateng's Termination from Employment*

Boateng met with Blair Guza, GDATP's Human Resources Manager, in March 2005 and with Dawn Archer, GDATP's Ethics Director, in April 2005. The parties dispute the content of these meetings. Boateng contends that she complained of race discrimination, expressed her desire to file a formal complaint, and inquired as to the process for filing such a complaint. Defendants contend that the meetings solely concerned Boateng's displeasure with her performance evaluation and that she made no mention of a desire to file a discrimination claim or a formal complaint under the Dispute Resolution Policy.

Around this time, Boateng was asked to participate in a Performance Improvement Plan. According to Boateng, the plan required that she move to Michigan for a six-month period in order to work for Friedman directly. When Boateng refused to comply, a revised plan was issued in April 2005. She alleges that the revised plan still required her to work for Friedman in Michigan. Boateng again indicated that she was unwilling to participate in the plan. On April 22, 2005, Guza informed Boateng that she was being terminated. Defendants contend that she was terminated for a legitimate, nondiscriminatory reason having nothing to do with her race; specifically, her continually deficient performance and refusal to accept a mandatory Performance Improvement Plan.

Following her termination, Boateng filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"). The EEOC dismissed the charge because "[b]ased upon its investigation, the EEOC [was] unable to conclude that the information obtained establishe[d] violations of the statutes." She filed a subsequent Charge of Discrimination with

the EEOC, which was dismissed as "not timely filed."

## II. *Procedural History*

Boateng instituted the present action against General Dynamics on December 30, 2005. On March 15, 2006, she filed an amended complaint in which she named GDATP as an additional defendant. The five-count amended complaint alleges (1) race discrimination and retaliation in violation of 42 U.S.C. § 1981; (2) discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e; (3) retaliation in violation of Title VII; (4) intentional misrepresentation/fraud; and (5) negligent misrepresentation.

In April 2006, defendants filed a motion to transfer venue, as well as the present motion to dismiss or, in the alternative, to compel arbitration and to stay litigation. On November 2, the Court denied defendants' motion to transfer.

## III. *Analysis*

The Federal Arbitration Act, 9 U.S.C. § 1 *et seq.*, governs the enforcement of written arbitration agreements, including agreements in most employment contracts. *See Circuit City Stores, Inc. v. Adams,* 532 U.S. 105, 119, 121 S.Ct. 1302, 149 L.Ed.2d 234 (2001) (holding that the FAA extends to employment cases for employees other than those engaged in transportation). It was enacted in order to reverse longstanding judicial hostility to arbitration agreements and to "place such agreements upon the same footing as other contracts." *Allied–Bruce Terminix Cos., Inc. v. Dobson,* 513 U.S. 265, 271, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995) (citation and internal quotation omitted). The FAA states, in pertinent part, that:

> A written provision in ... a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2. The act promotes "a liberal federal policy favoring arbitration agreements .... [and] any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24–25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983).

"When an enforceable arbitration agreement exists between the parties, a court may enforce that agreement by staying existing litigation pending arbitration of the parties, 9 U.S.C. § 3, or compelling the parties to arbitrate, 9 U.S.C. § 4." *DeLuca v. Bear Stearns & Co.,* 175 F.Supp.2d 102, 106–07 (D.Mass.2001). Defendants contend that the Dispute Resolution Policy Agreement constitutes a valid, enforceable arbitration agreement, and that this case should accordingly be dismissed or stayed pending arbitration. In response, Boateng contends that (1) the Agreement is unenforceable because she does not recall receiving a copy of the Policy and never agreed to be bound by its terms, and (2) even if she had so agreed, the defenses of waiver, estoppel, and material breach of contract preclude defendants from enforcing the Agreement.

### A. *Whether the Agreement Is Enforceable*

The Civil Rights Act of 1991 provides that "[w]here appropriate and to the extent authorized by law ... arbitration ... is encouraged to resolve disputes arising under [these laws]." Civil Rights Act of 1991, Pub.L. No. 102, § 118, 105 Stat. 1071, 1081 (1991). Interpreting this statutory language, the First Circuit has indicated that two factors must be satisfied before an arbitration agreement can be

enforced in the context of a Title VII claim: a party "can prevail on its demand for arbitration only if it can establish that the provision for mandatory arbitration is part of a valid contract within the purview of the FAA and this court finds that the enforcement of the arbitration provision would be appropriate" under Title VII. *See Campbell v. General Dynamics Gov't Sys. Corp.,* 407 F.3d 546, 554–55 (1st Cir.2005); *see also Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 170 F.3d 1, 18–19 (1st Cir.1999).

■ As to the "validity" factor, the First Circuit has stated that "[a]t a minimum the words 'to the extent authorized by law' [in the Civil Rights Act of 1991] must mean that arbitration agreements that are unenforceable under the FAA are also unenforceable when applied to claims under Title VII." *Rosenberg,* 170 F.3d at 19. The question of whether an arbitration agreement is enforceable under the FAA "is generally determined by reference to common-law principles of general applicability." *Id.* (citing *Perry v. Thomas,* 482 U.S. 483, 492 n. 9, 107 S.Ct. 2520, 96 L.Ed.2d 426 (1987)). To determine whether "the parties agreed under the FAA to arbitrate a certain matter, courts generally ... should apply ordinary state-law principles that govern the formation of contracts." *Id.* (quoting *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 944, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995)).

■ As to the "appropriateness" factor, the First Circuit has indicated that the determination is case-specific, and "hinges on whether, under the totality of the circumstances, the employer's communications to its employees afforded 'some minimal level of notice' sufficient to apprise those employees that continued employment would effect a waiver of the right to pursue the claim in a judicial forum." *Campbell,* 407 F.3d at 555. The Court went on to state that "[i]n many cases, an employer will be able to satisfy this relatively light burden by producing evidence demonstrating that the employee had actual notice of the agreement." *Id.*

■ In the present case, Boateng contends that the Agreement fails to satisfy either prong of the test; that is, she contends that the Agreement is unenforceable under the FAA and that enforcing its mandatory arbitration requirement would be inappropriate in this case. As the basis for both contentions, she maintains that she did not receive a copy of the Policy, and thus (1) there was no "meeting of the minds" and therefore no valid contract pursuant to the FAA, and (2) she was not given sufficient notice that her continued employment constituted a waiver of her right to a judicial forum.

Defendants respond that plaintiff did receive sufficient notice of the Policy and its terms and that the Agreement is therefore enforceable. In support of their position, defendants presented affidavit evidence of the following:

- When plaintiff was hired, execution of the Dispute Resolution Policy Agreement was a condition of employment. This was stated in the letter offering her employment.
- The Policy was included in the package of documents that was sent to her, and that is sent to all new employees as the company's standard practice.
- Defendants know that she received this packet, since she signed and returned other forms that were included in this packet.
- Among the documents plaintiff signed and returned was the Dispute Resolution Policy Agreement, which states: By this Agreement (the "Agreement"), I agree to the exclusive resolution of all claims arising out of or relating to my application for employment, employment, or termination of employment by the terms of the Com-

pany's Dispute Resolution Policy ("DRP") attached hereto as Exhibit A. The claims covered by this Agreement, shall include, but are not limited to, all statutory or common law claims for wages, breach of any express or implied promises, torts, discrimination on any basis, but shall not include claims for worker compensation, unemployment compensation, claims for preliminary injunctive relief as to intellectual property and trade secrets, or claims under any benefit plans, pension plans or other agreements that have their own dispute resolution procedures.

I understand that, as a result of this Agreement, I and the Company have waived the right to jury trial and to file and [sic] lawsuit except as may be necessary to enforce the terms of this Agreement.

- Plaintiff was given a copy of the Policy with her orientation materials.
- Plaintiff was told at the same time that she could access the Policy on the company's intranet.
- When the Policy was amended, a copy was sent to her home via mail and was e-mailed to her. This e-mail was accessed on her account on October 1, 2003.
- It is the company's standard practice to mail legal and employment documents and notices to employees at their homes, including, but not limited to, the company newsletter, annual report, notification/information regarding benefits/enrollment periods, pay stubs, 401(k) mailings, corporate announcements and employment offers and accompanying disclosures and contracts.
- At no time have any of the mailings that have been sent to Boateng's home

address been returned to GDATP by the mail carrier signifying that it had not been received by her.

- Documents mailed to her home address, requiring a written response from her, have always been received by Boateng and returned to the employer.

In response, Boateng does not dispute that she signed the Agreement, and does not even directly deny that she received the Policy. Instead, she submitted an affidavit stating that she cannot "recall" whether she was ever given a copy. In other words, plaintiff suggests that she might, or might not, have received the Policy; she cannot remember. That is not sufficient, under the circumstances, to rebut defendants' overwhelming evidence that she did, in fact, have actual knowledge of the Policy and its terms. Accordingly, the Court finds (1) that the Agreement constitutes a valid contract, enforceable under the FAA, and (2) that enforcement of the arbitration requirement would be appropriate in this particular case.

### B. Whether Arbitration Is Precluded by Waiver, Estoppel, or Material Breach

Plaintiff contends that even if an enforceable arbitration agreement exists between the parties, defendants are nonetheless precluded from asserting their right to arbitration. In essence, she contends that her 2005 meetings with GDATP's Human Resources Manager and its Ethics Director qualified as Level 1 of the dispute resolution process (Human Resources Review) and that she therefore effectively invoked the Policy. She further contends that GDATP's failure to provide her with written notice of a "Final Determination of the Human Resources Review" constitutes a material breach of the Policy.[1] As a result of this alleged breach, plaintiff con-

1. The Policy provides, in relevant part:

**Level 1—Human Resources**

tends that defendants have waived their right to arbitrate and are estopped from enforcing the Agreement. Defendants dispute Boateng's characterization of the 2005 meetings, and respond that, in any event, issues of waiver, breach, and estoppel should be decided by the arbitrator, not the Court. The Court agrees with defendants that those issues are for the arbitrator to decide.

### 1. Division of Responsibilities Between Arbitrator and the Court

■■■■■ As a general matter, the division of labor between courts and arbitrators is a matter of contract interpretation. *See Green Tree Fin. Corp. v. Bazzle,* 539 U.S. 444, 451–52, 123 S.Ct. 2402, 156 L.Ed.2d 414 (2003). Sometimes, as here, a contract is silent as to the appropriate division. Accordingly "[c]ertain presumptions have been constructed to aid in the resolution of these issues of division of responsibility; these presumptions generally hold in the absence of clear and unmistakable evidence to the contrary." *Marie v. Allied Home Mortgage Corp.,* 402 F.3d 1, 9 (1st Cir.2005) (citation and internal quotation omitted).

■■■■■ The Supreme Court recently clarified how these presumptions operate. *See Howsam v. Dean Witter Reynolds, Inc.,* 537 U.S. 79, 84–85, 123 S.Ct. 588, 154 L.Ed.2d 491 (2002); *Green Tree,* 539 U.S. at 444, 123 S.Ct. 2402. As the court explained, "at least two sorts of questions [are] presumptively for the *court* to decide: (1) 'whether the parties are bound by a given arbitration clause,' and (2) 'whether a concededly binding arbitration clause applie[s] to a particular type of controversy.' " *Marie,* 402 F.3d at 10 (quoting *Howsam,* 537 U.S. at 84, 123 S.Ct. 588) (emphasis in original). By contrast, " 'procedural' questions which grow out of the dispute and bear on its final disposition are presumptively *not* for the judge, but for an arbitrator, to decide." *Howsam,* 537 U.S. at 84, 123 S.Ct. 588 (citation and internal quotation omitted) (emphasis in original). Illustrating the types of issues that might qualify as "procedural," the Court in *Howsam* expressly stated that "the presumption is that the arbitrator should decide allegations of waiver, delay, or a like defense to arbitrability." *Id.* (citation and internal quotation omitted).

### 2. Litigation–Related Waiver

The Supreme Court's express language in *Howsam,* although dicta, suggests that Boateng's asserted defenses of waiver, estoppel, and material breach are matters for the arbitrator, rather than the Court, to decide. Plaintiff points, however, to a number of post-*Howsam* cases in which the First Circuit did not address the Supreme Court's presumptive division of responsibilities and continued to decide questions of waiver itself. *See, e.g., In re Citigroup, Inc.,* 376 F.3d 23, 26–29 (1st Cir.2004); *Rankin v. Allstate Ins. Co.,* 336 F.3d 8, 12–14 (1st Cir.2003); *Restoration*

---

1. **Description**—Human Resources will informally meet with the Employee, his or her supervisor and other parties involved in the dispute to ascertain the circumstances and to try to resolve the matter informally and by agreement of the persons involved. Written notice of the Final Determination of the Human Resources Review will be sent to the Employee, regardless of the outcome and will include the date of Final Determination, as well as a brief description of the resolution, if any.

2. **Submission of Request for Human Resources Review and Time Limits**—It is Company policy that the Employee should file a Notice of Dispute with Human Resources within thirty (30) days after the dispute arises or the dispute is not successfully resolved with the Employee's immediate supervisor or the management chain of command. This is a guideline, and shall not be applied to prevent the resolution of claims submitted within the applicable statute of limitations ...

*Pres. Masonry, Inc. v. Grove Europe Ltd.,* 325 F.3d 54, 60–62 (1st Cir.2003).

The First Circuit recently explained this apparent conflict in *Marie v. Allied Home Mortgage Corp.,* 402 F.3d 1 (2005). In *Marie,* the Court acknowledged that in its recent case law, it had repeatedly decided issues of waiver itself without discussing the impact of *Howsam.* 402 F.3d at 12.[2] It then proceeded to affirm the validity of those decisions by holding that the Supreme Court did not intend in *Howsam* to modify the traditional rule that "waiver due *to litigation conduct* was generally for the court and not for the arbitrator." *Id.* (emphasis added).[3] In holding that issues of litigation-conduct waiver were for the court, the court emphasized (1) that where the alleged waiver arises out of conduct within the very same litigation in which the parties are seeking to compel arbitration or stay proceedings, "the district court has power to control the course of proceedings before it and to correct abuses of those proceedings;" (2) that the comparative expertise of judges weighs in favor of them deciding litigation issues; (3) that judges are well-trained to recognize abusive-forum shopping; and (4) that it would be particularly inefficient to have the case bouncing "back and forth between tribunals without making any progress." *Id.* at 13–14.

The alleged waiver at issue here is not based on litigation conduct. The *Marie* court expressly declined to consider the issue of whether waiver not based on litigation conduct properly belonged with the court or the arbitrator.[4] The question then, is whether the Court should extend the First Circuit's holding in *Marie* to cover the non-litigation-related waiver alleged in this case. The Court declines to do so.

 This conclusion is supported by a number of factors. First, it comports with the language of *Howsam* that "allegations of waiver, delay, or a like defense to arbitrability" should be decided by the arbitrator. 537 U.S. at 84, 123 S.Ct. 588. Second, determination of this issue involves questions of fact (e.g., whether Boateng reported her complaints of discriminatory and retaliatory treatment during the 2005 meetings) and contract interpretation (e.g., whether the Agreement requires that the dispute resolution process be invoked formally, in writing). Arbitrators are well-suited to answer such questions. *See Green Tree,* 539 U.S. at 453, 123 S.Ct. 2402. And third, allowing the arbitrator to decide the waiver issue in this case is in line with the liberal federal policy in favor of arbitration, and the general rule that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp.,* 460 U.S. at 24–25, 103 S.Ct. 927.[5]

---

**2.** According to the *Marie* Court, discussion of the Supreme Court's presumptive division of responsibilities was most likely omitted from these cases because no party had raised the issue. 402 F.3d at 12.

**3.** According to the Court, courts in this circuit have traditionally conducted "the inquiry into whether, by choosing or allowing the litigation of its claims before a court [or other litigation forum] rather than an arbitrator, a party has waived its right to arbitrate." *Marie,* 402 F.3d at 12.

**4.** The Court stated in a footnote:

The conduct allegedly constituting waiver in a given case could conceivably be non-litigation-related, although in practice virtually all cases have involved litigation-related waiver. We do not here discuss the proper presumptive division of labor as between courts and arbitrators for non-litigation-related waiver claims or for other doctrines that are sometimes (erroneously) referred to as waiver, such as laches.
*Marie,* 402 F.3d at 14 n. 9.

**5.** The Court notes that a recent decision by the First Circuit arguably conflicts with this conclusion. *See In re Tyco Int'l Ltd. Securities*

Accordingly, the Court holds that in the circumstances of this case, Boateng's asserted defenses to arbitrability, including the defense of non-litigation-related waiver, should be decided by the arbitrator.

\* \* \* \* \* \*

 Having determined that the Dispute Resolution Policy Agreement constitutes a valid, enforceable arbitration agreement between the parties, that enforcement of the Agreement would be appropriate in the circumstances of this case, and that the defenses to arbitration raised by plaintiff are for the arbitrator to decide, the Court must now determine the proper disposition of this case. Defendants urge the Court to dismiss in favor of arbitration. The Court declines to do so, and instead elects to grant defendants' alternative request for relief. Among other things, given the possibility that the arbitrator may conclude that arbitration was in fact waived, and therefore may return the case to this Court, the Court elects to stay the proceedings pending arbitration.

Finally, at oral argument, defendants requested that rather than proceeding directly to arbitration, plaintiff should be required to avail herself of all four steps set forth in the Dispute Resolution Policy. The Court declines to so order. Rather, it will be left to the arbitrator to decide— once it is determined if defendants have waived their rights under the Policy— whether to proceed directly to arbitration, or to pursue some other course.

### IV. *Conclusion*

For the foregoing reasons, defendants' motion to dismiss, or in the alternative, to compel arbitration and to stay litigation is GRANTED in part and DENIED in part. This matter is referred to binding arbitration in accordance with the Dispute Resolution Policy Agreement executed by plaintiff Yvonne Boateng on October 11, 2002. The litigation is hereby stayed pending arbitration.

**So Ordered.**

*Litig.*, 422 F.3d 41 (1 st Cir.2005). Although the issue of waiver in *Tyco* was not litigation-related, it was nonetheless decided by the Court, rather than the arbitrator. 422 F.3d at 45–46. *Tyco*, however, is distinguishable from the present case.

First, the alleged waiver in *Tyco* was based on a letter in which the party unambiguously stated that he did not consent to arbitration. 422 F.3d at 44. Accordingly, the case raised few, if any, questions of fact or contract inter-

pretation. Second, unlike the present case, *Tyco* involved at least some issues of litigation-related waiver, which the First Circuit had previously held were for the court to decide. *See id.* at 46 ("Finally, the dilatory tactics engaged in by Swartz continued even after Tyco filed its district court complaint in March 2003."). Finally, the issue of division of labor between the court and the arbitrator does not appear to have been raised or discussed in the case at all.